# United States Tax Court

T.C. Memo. 2023-72

WENDELL H. MURPHY, JR. AND WENDY F. MURPHY,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

WENDELL H. MURPHY AND LINDA G. MURPHY,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 14536-16, 14541-16.          Filed June 15, 2023.

————

Ps, through S-corp, owned two tracts of land ("Tract 1" and "Tract 2"), which they developed into a residential community with two golf courses, a clubhouse, a recreation facility, and multiple nature trails. Tract 1 shares a border with a river (and is adjacent to a wildlife reserve), and Tract 2 is an interior, land-locked tract to the north. S-corp donated by deed in 2010 perpetual conservation easements (each constituting a "qualified real property interest" under I.R.C. § 170(h)(1)(A)) on Tract 1 and Tract 2 to a "qualified organization" under I.R.C. § 170(h)(1)(B). Relying on appraisals, Ps claimed charitable contribution deductions of $8,424,909 for the Tract 1 easement and $1,080,814 for the Tract 2 easement as "qualified conservation contribution[s]" under I.R.C. § 170(h) on their tax returns, prepared by a competent professional who was given all the information he requested. Ps' expert valued the easements on the basis

[*2] that each tract would be developed as residential housing, assuming in each instance that the other tract would remain a golf course. Attached to the return was an incomplete Form 8283, "Noncash Charitable Contributions", that did not report Ps' basis in either Tract 1 or Tract 2.

R examined Ps' returns and issued to them Notices of Deficiency ("NODs") determining to disallow the deductions. The NODs stated only that Ps' individual returns were being adjusted in accordance with the results of S-corp's examination. The NODs did not determine any penalties. Ps filed petitions in this Court challenging the determinations in the NODs.

In his amended answer, R asserted (for the first time, i.e., as "new matter") accuracy-related penalties under I.R.C. § 6662. Before trial, R also asserted (again, as "new matter") that Ps' charitable contribution deductions should be entirely disallowed on the basis of the incomplete Form 8283 appraisal summaries required by I.R.C. § 170(f)(11)(C) and Treas. Reg. § 1.170A-13(c)(4). R agrees he has the burden of proof as to "new matter".

The issues for decision are: (1) whether Ps failed to comply with the substantiation and reporting requirements of I.R.C. § 170(f)(11), and if so, whether that failure is excusable for reasonable cause under I.R.C. § 170(f)(11)(A)(ii)(II); (2) whether the easements donated on Tract 1 and on Tract 2 are "qualified conservation contribution[s]" under I.R.C. § 170(h)(1); (3) the values of the easements granted on Tract 1 and Tract 2; and (4) whether any penalties under I.R.C. § 6662 are applicable.

*Held*: Ps failed to comply (strictly or substantially) with the substantiation and reporting requirements of I.R.C. § 170(f)(11), but that failure was due to reasonable cause because R failed to carry his burden to disprove reasonable cause.

*Held, further*, the easement on Tract 1 protects a "relatively natural habitat of fish, wildlife, or plants, or

**[*3]** similar ecosystem" within the meaning of I.R.C. § 170(h)(4)(A)(ii), and the easement on Tract 2 preserves "land areas for outdoor recreation by, or the education of, the general public" within the meaning of I.R.C. § 170(h)(4)(A)(i).

*Held, further*, the value of the easement granted on Tract 1 is $2,790,274 (about $4.5 million less than Ps claimed), and the value of the easement granted on Tract 2 is $100,000 (about $900,000 less than Ps claimed).

*Held, further*, unless otherwise conceded by the Commissioner, Ps are liable for gross valuation misstatement penalties under I.R.C. 6662(h).

————————

*David D. Aughtry*, *John W. Hackney*, and *Kristen S. Lowther*, for petitioners.

*Amy Dyar Seals*, *Olivia Hyatt Rembach*, *Corey R. Clapper*, and *Ashley M. Bender*, for respondent.

## TABLE OF CONTENTS

MEMORANDUM FINDINGS OF FACT AND OPINION ..................... 6

FINDINGS OF FACT ............................................................. 7

    The Murphy family ....................................................... 7

    Duplin Land and River Landing ................................... 8

        Developing River Landing ...................................... 8

        The two golf courses .............................................. 9

        Natural habitat on the River Tract ...................... 10

        Public access to River Landing ............................. 11

    The easement donations in 2010 ................................. 11

        The River Tract easement...................................... 12

        The Landing Tract easement................................. 16

        Valuing the River Tract easement and the Landing Tract easement in 2010................................................... 17

4

[*4] Reporting the easement donations on the 2010 tax returns ........ 18

Duplin Land's 2010 return.................................................. 18

The Murphys' individual returns ......................................... 19

Examinations, notices, and Tax Court proceedings...................... 19

IRS examination of Duplin Land's return............................ 19

NOD to Wendell and Linda Murphy .................................... 19

NOD to Dell and Wendy Murphy ......................................... 20

Petitions and answers........................................................ 20

Trial of these cases ........................................................... 21

The value of the donated easements............................................. 21

OPINION.......................................................................................... 22

I.   Burden of proof and production ...................................... 22

     A.   The general rules ...................................................... 22

          1.   Burden of proof under Rule 142................................ 22

          2.   Burden of production under section 7491(c).................... 22

     B.   The "new matter" exception...................................... 23

          1.   The nature of "new matter"............................... 23

          2.   The "reasonable cause" defense as to penalty ................. 24

          3.   The "reasonable cause" defense as to a "new matter"
               substantiation issue under section 170(f)(11)(A)(i) ......... 25

II.  The substantiation requirements of section 170(f)(11) and
     Treasury Regulation § 1.170A-13(c) ........................... 28

     A.   A description of the requirements......................... 28

     B.   Compliance with the requirements....................... 30

          1.   Strict compliance ............................................. 30

          2.   Substantial compliance ................................... 31

     C.   Reasonable cause for noncompliance .................... 33

III. Qualified conservation contributions under section 170(h).......... 37

     A.   The requirements for a "qualified conservation
          contribution"...................................................... 38

     B.   The parties' dispute as to conservation purpose.................... 38

**[\*5]**    1.    The statute lists "conservation purpose[s]". ..................... 38

2.    The deeds state "Conservation Purposes". ...................... 39

3.    We consider only a conservation purpose that is stated in the deed. ............................................................. 42

4.    The River Tract easement does protect "a relatively natural habitat". .............................................................. 48

5.    The Landing Tract easement does preserve a land area for outdoor recreation and education. ..................... 57

C.    The River Tract and Landing Tract easements protect their conservation purposes in perpetuity. ........................... 60

1.    The statute and regulations permit but limit a donor's reservation of rights............................................ 60

2.    Rights are reserved in the River Tract and Landing Tract easement deeds. .................................................... 61

3.    The River Tract easement deed protects its conservation purpose in perpetuity notwithstanding the reserved rights............................................................ 62

4.    The reserved rights in the Landing Tract easement deed facilitate its perpetual conservation purpose. ........ 63

IV.   Valuing the easement donations................................................... 63

A.    General principles of valuation ............................................ 63

B.    Valuation under consistent assumptions about development ............................................................................ 65

C.    Valuation of the River Tract easement .................................. 66

D.    Valuation of the Landing Tract easement ............................. 68

V.    Penalties under section 6662 ....................................................... 69

A.    Penalty principles .................................................................. 69

B.    Section 6662 penalties with respect to Duplin Land and Wendell and Linda Murphy individually.............................. 70

VI.   Conclusion.................................................................................... 72

**[\*6]**     MEMORANDUM FINDINGS OF FACT AND OPINION

GUSTAFSON, *Judge*:  At issue in these consolidated cases are charitable contribution deductions under section 170(h)[1] for the donation in 2010 of two conservation easements by members of the Murphy family—through an S corporation, Duplin Land Development, Inc. ("Duplin Land")—to the North American Land Trust ("NALT").  The IRS issued to Wendell H. Murphy, Sr. ("Wendell"), and Linda G. Murphy, and to Wendell H. Murphy, Jr. ("Dell"), and Wendy F. Murphy, notices of deficiency ("NODs") determining inter alia to disallow two charitable contribution deductions (of $1 million and $7.3 million) claimed on their respective Forms 1040, "U.S. Individual Income Tax Return", that were passed through to them from Duplin Land's Form 1120–S, "U.S. Income Tax Return for an S Corporation", and determining associated deficiencies in federal income tax for 2010.  Both married couples filed timely petitions challenging their deficiencies.

After concessions, the remaining issues for decision are: (1) whether the Murphy family[2] satisfied the substantiation and reporting requirements of section 170(f)(11); (2) whether the two easements donated through Duplin Land were "exclusively for conservation purposes" within the meaning of section 170(h)(1)(C), (4)(A), and (5)(A); (3) the fair market value of each conservation easement; and (4) whether petitioners are liable for any penalties under section 6662.  We hold that petitioners did not satisfy the reporting requirements of section 170(f)(11) but that their failure to do so was for reasonable cause.  We further hold that each easement donated by Duplin Land satisfies a conservation purpose under section 170(h)(4)(A) and protects its conservation purpose in perpetuity.  Finally, we hold that the values of the easements donated by Duplin Land are $100,000

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., as in effect at the relevant times; regulation references are to the Code of Federal Regulations, Title 26 ("Treas. Reg."), as in effect at the relevant times; and Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded.  A citation of a "Doc." in this Opinion refers to a document as numbered in the Tax Court docket record of Docket No. 14536-16, and a pinpoint citation therein refers to the pagination as generated in the digital file.

[2] In this Opinion we sometimes collectively refer to Wendell and Linda Murphy, Dell and Wendy Murphy, and their related entity Duplin Land, as "the Murphy family".  Where specificity is necessary, we will refer to each petitioner or entity by name.

[*7] and $2,790,274 (i.e., less than was claimed on Duplin Land's return) and that penalties are applicable to Wendell and Linda Murphy.

## FINDINGS OF FACT

When the respective petitions were filed in these cases, Wendell and Linda Murphy resided in Florida, and Dell and Wendy Murphy resided in North Carolina. The likely forum for an appeal in these cases is the U.S. Court of Appeals for the Eleventh Circuit.[3]

*The Murphy family*

The Murphy family is a multi-generation farming family from Bladen County, North Carolina, which has operations throughout the country. The Murphy family is well known for its success and innovation in the hog-farming industry, and Wendell Murphy (the patriarch of the family) helped develop various processes that became industry-standard practices in hog farming. Wendell Murphy also taught agriculture classes to high school students and was active in various environmental projects and policy proposals submitted to the North Carolina state legislature.

In the early to mid 1990s, Wendell Murphy and his son Dell expanded the Murphys' business to include real estate development, discussed in greater detail below. Wendell remained actively involved in the Murphys' business until sometime around 2010, when he and Linda retired to Florida. By that time Dell was managing the Murphys'

---

[3] In the event of separate appeals by the petitioners in the two cases, venue for an appeal by Dell and Wendy Murphy in Docket No. 14536-16 would be the U.S. Court of Appeals for the Fourth Circuit, and venue for an appeal by Wendell and Linda Murphy in Docket No. 14541-16 would be the Eleventh Circuit, unless the parties stipulate otherwise pursuant to section 7482(b)(2). *See* § 7482(b). However, the Commissioner acknowledges that "if respondent prevails in the case, petitioners could choose to file an appeal from these consolidated cases to either the United States Court of Appeals for the Fourth Circuit or the United States Court of Appeals for the Eleventh Circuit. *See Estate of Israel v. IRS*, 159 F.3d 593, 595–96 (D.C. Cir. 1998); *Buckrey v. Comm'r*, T.C. Memo 2017-138 at 5 n.11 (2017)." Doc. 143, ¶ 2. Petitioners make it clear, *see* Doc. 144, that their preferred venue is the Eleventh Circuit, the court that decided *Champions Retreat Golf Founders, LLC v. Commissioner*, 959 F.3d 1033 (11th Cir. 2020), *vacating and remanding*, T.C. Memo. 2018-146. We will therefore follow the precedent of the Eleventh Circuit, discussed below in Part III.B.4. *See Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

**[*8]** business, which included 50 hog-farming facilities as well as various real estate projects and investments in North Carolina.

*Duplin Land and River Landing*

The Murphy family formed Duplin Land in September 1993. In 1993 Duplin Land acquired two adjacent tracts of undeveloped land—one ("the River Tract") along the northern border of the Northeast Cape Fear River and another ("the Landing Tract") to the north—containing wetlands and flood plains dense with trees and vegetation.[4] Over several years, Duplin Land acquired smaller parcels of land adjacent to these two tracts (for an eventual total of 1,350 acres)[5] and ultimately developed River Landing—a residential community with two golf courses.

*Developing River Landing*

While creating a development plan for River Landing, Duplin Land hired consultants and surveyors to identify and mark protected wetland areas on the River Tract and the Landing Tract. The U.S. Army Corps of Engineers ("USACE") approved that the development proposed by Duplin Land would not harm any existing wetland areas. Duplin Land also obtained approval from Duplin County to develop River Landing. After the USACE and Duplin County approved the development of River Landing, Duplin Land began raising and grading ground, clearing trees, installing paved roads and hiking trails, and building retention ponds. The development transformed 1,350 acres of rural land into a gated 1,500-lot[6] residential community featuring two 18-hole golf courses, a clubhouse, recreation facilities, and nature trails.

---

[4] The physical characteristics of the River Tract and the Landing Tract resemble the nearby Angola Bay Game Land, which is 34,000 acres of natural habitat managed by the North Carolina Wildlife Resources Commission. The Angola Bay Game Land is immediately east of the River Tract on the other side of the Northeast Cape Fear River.

[5] The River Tract consists of 16 parcels of land in Duplin County, and the Landing Tract consists of 23 parcels of land in Duplin County. At no time was either tract subject to any zoning restrictions.

[6] This 1,500-lot figure represents the total number of lots platted in the development plan for River Landing, with most of the lots being in the northern portion of the property, away from the Northeast Cape Fear River and wetland areas. As of 2010, 1,200 to 1,350 lots had been sold, but only 350 residents were actually living in River Landing.

[*9] Although developed, River Landing preserved numerous open spaces containing lakes, ponds, wooded areas, and river frontage.

*The two golf courses*

Two 18-hole championship golf courses are part of River Landing: the River Course (which opened in 1996) and the Landing Course (which opened in 2006). The River Course covers approximately 241 acres of the River Tract. Single-family lots are platted along the northern, western, and eastern sides of the River Course, and the Northeast Cape Fear River borders its southern side. The River Course has significant water features, vegetation, and wetland areas throughout the central portions of the course. The Landing Course covers approximately 251 acres of the Landing Tract, is more centrally located within River Landing, and is surrounded by single-family lots on all sides, though it preserves some modest natural features such as trees, vegetation, and ponds. Both golf courses were designed by architect Clyde Johnson, who recommended minimizing the surface area of intensively managed fairways, greens, and tees to reduce the need for chemical fertilizers and pesticides and to maintain a more natural golf course with unmanicured, unmaintained "no mow" areas containing native grass and plant species in lieu of intensively managed turf grass.

The River Course and the Landing Course were open year round and were played by country club members[7] (both resident and non-resident) and their guests, as well as by resident non-members and the general public, who could play either course by reserving a tee time through the pro shop or through third-party vendors and paying a fee.[8] River Landing also sponsored and hosted charity golf tournaments, summer youth programs, high school and college golf competitions, and other sporting and recreational events. By 2010 the River Course ranked number 25 out of the Top 50 golf courses in North Carolina, and the Landing Course ranked number 48. From 2008 to 2010 an average of 36,000 total rounds of golf were played annually at River Landing. But despite the popularity of the River Landing golf courses, they incurred net operating losses every year from 1996 to 2010.

---

[7] By 2010 there were 279 members of the River Landing country club.

[8] Neither party put on evidence about the amount of the fees charged to play on the River Landing golf courses. The Commissioner made no showing or contention that the reservation and fee requirements of these courses are more onerous than those a member of the public would face to play golf on a public municipal course.

**[\*10]** *Natural habitat on the River Tract*

The River Tract runs parallel to the Angola Bay Game Lands and Cape Fear River Basin conservation areas along the Northeast Cape Fear River and is ecologically consistent with those conservation areas as wetland forest. Despite the development of residential lots on the River Tract, of the 241 acres which comprise the River Course (and the River Tract easement, as discussed below at p. 12) approximately 52% is golf course tees, fairways, and greens, 15% is ponds, and the remaining 33% is tree cover. The pond portion of the River Tract consists of ten independent aquatic resources (streams, ponds, wetlands, and river). Most of the tree cover percentage is a cohesive forested corridor in the eastern part of the River Tract (bordered by River Course hole numbers three through eight to the east, south, and west, and by residential lots to the north) that, as petitioners' expert Heather L. Wallace stated in her report (discussed below at p. 53), contains "a globally imperiled variant of the blackwater cypress-gum swamp ecological association . . . termed the Atlantic Coastal Plain Blackwater Cove Woodland".

The River Tract contains diverse habitats including open space, upland forest, forest edge, ponds, streams, and wetlands, and is home to approximately 210 total plant and animal species (including 7 amphibians, 1 arachnid, 4 crustaceans, 1 fungus, 41 insects, 20 mammals, 4 mollusks, 8 reptiles, 34 vascular plants, 79 birds, and 12 fish). Of the total plant and animal species present on the River Tract, 32 were considered rare or significant by the U.S. Fish & Wildlife Service ("USFWS"), North Carolina Wildlife Resources Commission, North Carolina Natural Heritage Program, NatureServe, Partners in Flight, and National Audubon Society as of 2018, and 26 were considered rare as of 2010. Of the 32 rare or significant species present on the River Tract, 25 are birds, 1 is insect, and 6 are mammal.[9] Specific bird species of conservation importance that were observed foraging and roosting on the River Tract include the Northern Flicker, Pine Warbler, Red Headed Woodpecker, Downy Woodpecker, and Brown Thrasher, as well as the American Bald Eagle; and specific mammal species of conservation importance observed on the River Tract include the Eastern Fox Squirrel and the Tri-colored bat. Additionally, the habitat

---

[9] A table attached to the report of petitioners' expert, Ms. Wallace, summarizes the "Rare Animal Species of [the] River Tract Conservation Easement" and their respective conservation rankings in both 2010 and 2018.

**[*11]** of the River Tract is common for the American alligator, which has been seen and photographed by residents of River Landing.

### *Public access to River Landing*

River Landing is a gated community with guarded entrances (although River Landing is not enclosed by fences around the entire perimeter). Residents of River Landing may enter and exit the property at will, but members of the general public who wish to enter by car must first stop at the visitor's entrance and state their purpose for entering River Landing before a guard will open the gate and permit access to the property. For a member of the general public to play golf at either the River Course or the Landing Course, they must reserve a tee time and pay a fee, and then pass through the visitor's entrance. However, members of the general public who merely wish to use River Landing's hiking and biking trails can access the property through a paved trail at the entrance to River Landing without being inspected by the guards or paying any associated fee. This trail head is open and accessible at all times of the day and year.

### *The easement donations in 2010*

In 2010 the Murphy family donated five conservation easements—two of which are the subject of this Opinion[10]—to NALT, a section 501(c)(3) charitable organization that is a "qualified organization" for the purposes of section 170(h)(1)(B). The Murphys donated both easements at issue (located on the River Tract and the Landing Tract of the River Landing development) through Duplin Land.

On December 27, 2010, 17 years after it had first acquired the River Tract and the Landing Tract, Duplin Land granted to NALT two deeds of easement (the "River Tract easement deed" and the "Landing Tract easement deed"). Both the River Tract easement deed and the Landing Tract easement deed were recorded with the State of North Carolina, County of Duplin, on December 30, 2010. Before accepting the easement donations, NALT performed due diligence by inspecting the River Tract and the Landing Tract and reviewing the proposed River Tract easement deed and the proposed Landing Tract easement deed to

---

[10] The Commissioner initially challenged the deductibility of all five of the conservation easements donated by the Murphy family, but he has since conceded that petitioners are entitled to charitable contribution deductions for two of them (referred to by the parties as "Magnolia #3 and Magnolia #4"). One is at issue in *Murfam*, Docket No. 8039-16.

[*12] determine whether the donations were suitable for NALT's conservation easement program. After determining that the donations were suitable, NALT prepared a baseline documentation report for each easement ("River Baseline Report" and "Landing Baseline Report"), which summarized the donated easement, the respective conservation interest(s), and NALT's future role in monitoring the easement.

*The River Tract easement*

The River Tract easement covers 241 acres of the River Tract including the River golf course and surrounding undeveloped areas. The River Tract easement deed states its ostensibly plural "Conservation Purposes" as follows—

> WHEREAS, preservation of the Conservation Area shall serve the following purposes pursuant to 26 U.S.C. § 170(h)(4)(a) and 26 CFR § 1.170A-14(d)(i), (the "Conservation Purposes"):
>
> > Preservation of the Conservation Area as a relatively natural habitat of fish, wildlife, or plants or similar ecosystem

—but the deed thereby states a singular purpose: preservation of a "relatively natural habitat". The River Tract easement deed further states the following "Conservation Values":

> WHEREAS, the features of the Conservation Area having ecological significance (which may be hereinafter called the "Conservation Values") and the Conservation Purposes have been established in the reports, plans, photographs, documentation, and exhibits assembled by, and retained in the offices of, North American Land Trust (collectively called the "Baseline Documentation"), pursuant to 26 CFR §170A-14(g)(5), which describes, among others, the following Conservation Values of the Conservation Area:
>
> > The Conservation Area provides wildlife corridors, breeding habitat, foraging habitat, and shelter for at least fifty species of animals; and
> >
> > The Conservation Area provides the natural ecological requirements for at least one hundred species of plants; and

[*13]       The Conservation Area supports one natural community: Coastal Plain Bottomland Hardwoods (Blackwater Subtype); and

The Conservation Area contains wetlands that provide the adequate breeding habitat for obligate amphibians and invertebrate species; and

The Conservation Area provides the natural ecological requirements and supports at least two animal Species of Special Concern in North Carolina: Eastern Fox Squirrel (*Sciurus niger*), and Bald Eagle (*Haliaeetus leucocephalus*); and

The Conservation Area contains wetlands that hold and filter waters that drain into the Northeast Cape Fear River; and

Preservation of the Conservation Area provides suitable habitat for and supports 5 species of birds that are considered Species of Regional Importance as monitored by the Partners In Flight Species Assessment Database: Northern Flicker (*Colaptes auratus*), Pine Warbler (*Dendroica pinus*), Red Headed Woodpecker (*Melanerpes erythrocephalus*), Downy Woodpecker (*Picoides pubescens*), Brown Thrasher (*Toxostoma rufum*).

These "Conservation Values" all manifestly relate to the River Tract easement deed's stated purpose of preserving a "relatively natural habitat".

Article 2 of the River Tract easement deed sets forth the perpetual restrictive covenants, which generally prohibit Duplin Land (and its successors and assigns) from constructing additional structures, removing ground or surface water, paving new roads or paths, removing trees and other vegetation, altering topography or otherwise disturbing land or waterways, and introducing non-native invasive plant species. Article 2.3 requires Duplin Land to "use and apply the best environmental practices then prevailing in the golf industry", and it refers to the publication "Environmental Principles for Golf Courses in the United States" adopted by the Golf Course Superintendents Association of America, and to the "PGA Tour Agronomy Tournament Preparation Handbook".

**[\*14]** The perpetual restrictions in Article 2 of the River Tract easement deed are subject to certain reserved rights provided in Article 3, which permit the owner of the River Tract (i.e., Duplin Land and its successors) to make continued use of the easement property as a golf course. Specifically, Article 3.1 of the River Tract easement deed permits Duplin Land, without NALT's approval, to—

> construct the following types of additional Structures commonly accessory to the operation of a golf course or other use of the Conservation Area for outdoor recreation or outdoor education: rain shelters, rest stations, food concession stands, or other structures that enhance public recreation or education, with aggregate floor or ground surface area of all such Structures not exceeding 2,500 square feet and provided that no such activity shall have a material adverse effect on the Conservation Purposes. With the right set forth in this paragraph to construct additional Structures within the Conservation Areas shall also be included the right to remove trees or other vegetation and to grade and otherwise disturb land to the most limited extent necessary to exercise the Reserved Rights without having any material adverse effect on the Conservation Purposes.

In addition, Article 3.3—

> reserves the right, without prior consent of Holder [i.e., NALT], to continue to operate, repair, upgrade, maintain, and replace in the event of casualty loss, the Golf Course, at the time this Conservation Easement is granted, together with any Permitted Alterations, including those certain improvements, including but not limited to, structures, roads, cart paths, and other items including ball washing stands, waste baskets, signs, covered rest stops and bathroom facilities; roads and bridges; paved and unpaved cart paths; landscaping improvements, other types of vegetation; ponds, lakes, and other water courses; drainage ditches as well as irrigation and drainage lines; site work and grading; fairways, tee boxes, greens, and other golf course play areas, utility infrastructure; and all other improvements, if any, on the Conservation Area including but not limited to the following:

[*15] 3.3.1 Maintain in good and manicured condition the roads, trails or walkways, walkways, fairways, greens, tee boxes, sand traps, waste bunkers, areas in the rough, and other Golf Course play areas including any lakes, ponds, and other water courses which are an integral part of the Golf Course . . . . Included within this right of maintenance, without limitation, are the right to: prune or remove dead, unsightly or hazardous vegetation affecting any such fairway, rough or green, road, trail or walkway area; selectively cut and thin trees as well as the right to plant new trees and vegetation and make other landscaping improvements to maintain the playability and/or improve the attractiveness of the Golf Course; install or apply materials necessary to correct or impede erosion; grade earth to maintain a passable condition or to control or impede erosion; replace existing culverts, water control structures and bridges; and maintain roadside ditches.

. . . .

3.3.3 Fill, excavate, dredge, and transplant materials as is necessary for the creation and maintenance of typical golf course improvements . . . such as sand traps, tee boxes, fairways, greens, waste bunkers, areas in the rough, etc.

. . . .

3.3.5 Maintain, repair, and improve any structure, utility, or other apparatus or appurtenance located within the easement area.

3.3.6 Any such maintenance or alterations shall be conducted in accordance with a reasonable interpretation of the standards for golf course maintenance set out in Section 2.3 herein [requiring Duplin Land to follow the "best environmental practices then prevailing in the golf industry"].

However, the preamble paragraph of Article 3 in the River Tract easement deed provides that "the Reserved Rights set forth in . . . Article 3 shall not be construed to permit Owner [i.e., Duplin Land] to

**[*16]** violate the provisions of Section 2.3 [requiring Duplin Land to follow the best environmental practices then prevailing in the golf industry] and 2.4 [limiting the types of recreational activities permissible on the River Tract easement] which shall supersede the provisions of Article 3."

*The Landing Tract easement*

The Landing Tract easement covers 251 acres of the Landing Tract including the Landing golf course. The Landing Tract easement deed states its "Conservation Purposes" as follows:

> WHEREAS, preservation of the Conservation Area shall serve the following purposes pursuant to 26 U.S.C. § 170(h)(4)(a) and 26 CFR § 170A-14(d)(i), (the "Conservation Purposes"):
>
> > Preservation of the Conservation Area for outdoor recreation by, or the education of, the general public; and
> >
> > Preservation of the Conservation Area as open space which provides scenic enjoyment to the general public and yields a significant public benefit; and
> >
> > Preservation of the Conservation Area as open space which, if preserved, will advance a clearly delineated Federal, State or local governmental conservation policy and will yield a significant public benefit . . . .

That is, the Landing Tract easement deed states multiple purposes—outdoor recreation or education by the public, and open space for scenic enjoyment of the public and advancing of a governmental conservation policy. The Landing Tract easement deed also states "Conservation Values" similar to those provided in the River Tract easement deed.[11]

---

[11] The "Conservation Values" provided in the Landing Tract easement deed differ slightly from those stated in the River Tract easement deed with respect to the diversity of plant and animal species. For example, the "Conservation Values" provided in the Landing Tract easement deed state that the Landing Tract supports "at least fifty species of plants" and "at least one animal Species of Special Concern in North Carolina: Eastern Fox Squirrel", i.e., not an American Bald Eagle as in the River Tract easement deed.

[*17] Article 2 of the Landing Tract easement deed contains the same perpetual restrictive covenants as the River Tract easement deed, except that Article 2.4 of the Landing Tract easement deed provides the following additional provision:

> 2.4 Use By General Public. The Property is and shall continue to be and remain open for substantial and regular use by the general public for outdoor recreations or outdoor education activity, whether for use in the game of golf in the layout and formation of the Golf Course in place at the time of granting this Conservation Easement or for other outdoor recreation or education activities, provided that such activities do not involve the construction of substantial Structures or other improvements and do not otherwise conflict with the Conservation Purposes of the Conservation Easement. The forgoing is not intended to prohibit the charging of fees such as, but not limited to, greens, carts, concession, group, and social fees, so long as the Property is open for the substantial and regular use of the general public and so long as the establishment of such fees neither defeats such substantial and regular use by the general public use.

The reserved rights in Article 3 of the Landing Tract easement deed are identical to those in the River Tract easement deed, except that the Landing Tract easement deed contains one additional provision "reserv[ing] the right to provide an outdoor education program for the general public on a regular and substantial basis".

*Valuing the River Tract easement and the Landing Tract easement in 2010*

Before making the conveyances, Duplin Land engaged Mr. F. Bruce Sauter to appraise the River Tract easement and the Landing Tract easement. Mr. Sauter appraised each easement using a "before and after" valuation method. As to the River Tract, Mr. Sauter determined that its highest and best use before donation of the River Tract easement was medium and high-density development of 155 to 160 single-family homes, using a subdivision plan prepared by the C.E. Group, Inc. ("C.E. Group"). In valuing the River Tract easement, Mr. Sauter presumed that the Landing Course would continue to operate as a golf course, which would both preserve the incentive to develop the River Tract and increase its value. On these assumptions, Mr. Sauter

**[\*18]** determined that the value of the River Tract before the easement donation was $9,718,062, that its value after the easement donation was $2,374,119, and that therefore the value attributable to the River Tract easement was $7,344,095.

Mr. Sauter performed the same type of "before and after" valuation for the Landing Tract easement. Relying again on the subdivision plan prepared by the C.E. Group,[12] Mr. Sauter determined that the highest and best use of the Landing Tract before the easement donation was low-density development. In valuing the Landing Tract easement, Mr. Sauter presumed that the River Course would continue to operate as a golf course. (That is, in each valuation he presumed that the subject golf course would be discontinued and that the golf course on the other tract would continue to operate.) On these assumptions, Mr. Sauter determined that the value of the Landing Tract before the easement donation was $1,457,842, that its value after the easement donation was $377,028, and that therefore the value attributable to the Landing Tract easement was $1,080,814.

*Reporting the easement donations on the 2010 tax returns*

*Duplin Land's 2010 return*

The Murphy family engaged Dixon Hughes Goodman ("Dixon Hughes")—one of the largest certified public accountant ("CPA") firms in North Carolina—to prepare Duplin Land's Form 1120–S for the 2010 tax year. Dixon Hughes requested from the Murphy family all the information it deemed necessary to prepare Duplin Land's return, and the Murphy family provided all the information that had been requested from them by Dixon Hughes. Dixon Hughes prepared Duplin Land's return, Wendell and Linda Murphy's joint return, and Dell and Wendy Murphy's joint return on the basis of the information received from the Murphy family, and all returns were filed as they were prepared by Dixon Hughes. Duplin Land's return reported the donations of the River Tract easement and the Landing Tract easement and claimed corresponding charitable contribution deductions of $7,344,095 and $1,080,814. The return included Form 8283, "Noncash Charitable Contributions", for each easement which was signed by both Mr. Sauter

---

[12] We note that Mr. Sauter relied in part on the capacity plan prepared for the River Tract because no capacity plan was prepared for the Landing Tract in 2010, and we note further that the capacity plan prepared for the River Tract was somewhat simple in that the plan merely placed lots in the areas of the River Tract that had already been cleared for the golf course.

**[\*19]** and Andrew L. Johnson (the president of NALT) and included the cover letters of Mr. Sauter's appraisals. However, the following portions of Duplin Land's Forms 8283 were either incomplete or entirely blank: Page 1 included only Duplin Land's identifying information, but nothing about the contributions; and Page 2 failed to include the date and manner in which the donor acquired the property, the donor's cost or adjusted basis for the property, or whether the contribution was made as part of a bargain sale.

### The Murphys' individual returns

The Murphy family also engaged Dixon Hughes to prepare their personal tax returns. Wendell and Linda Murphy claimed charitable contribution deductions for the donations of the River Tract easement and the Landing Tract easement on their joint 2010 Form 1040, "U.S. Individual Income Tax Return", according to the amounts passed through to them from Duplin Land's return and shown on Schedule K–1, "Shareholder's Share of Income, Deductions, Credits, etc."—as did Dell and Wendy Murphy. The two couples' joint returns included Forms 8283 that, for purposes of cost basis and date of acquisition on Page 1, stated "FROM SCHEDULE K–1 (FORM 1065 OR 1120S)", reported the respective fair market value of each contribution, and then stated "SEE ATTACHED STMTS". Copies of Mr. Sauter's and Mr. Piner's appraisals were also attached to the Murphy family's individual returns.

## Examinations, notices, and Tax Court proceedings

### IRS examination of Duplin Land's return

The IRS examined Duplin Land's 2010 return, determined to disallow the charitable contribution deductions for the donations of the River Tract easement and the Landing Tract easement, and proposed adjustments that subsequently affected the Murphy family's individual returns for 2010. No notices or determinations issued to Duplin Land were made part of the record in these cases, and we therefore rely, for information about the Duplin Land adjustments, on the NODs issued to the Murphys for their individual returns, as explained below.

### NOD to Wendell and Linda Murphy

On March 28, 2016, the IRS issued to Wendell and Linda Murphy an NOD determining a $764,723 deficiency in tax for 2010. The NOD did not determine any penalties. The NOD included Form 886–A, "Explanation of Items," which listed adjustments to charitable

[*20] contributions by Duplin Land and stated: "Your return is being adjusted in accordance with the examination results of [Duplin Land's return]." The corresponding adjustment reduced their claimed charitable contributions from Duplin Land from $1,505,206 claimed on the return down to $758. The NOD to Wendell and Linda Murphy did not assert liability for any penalty, nor did it determine to deny the charitable contribution deduction on the basis of their failure to satisfy the substantiation and reporting requirements of section 170(f)(11).

*NOD to Dell and Wendy Murphy*

On March 28, 2016, the IRS also issued to Dell and Wendy Murphy an NOD determining a $918,994 deficiency in tax for 2010. The NOD did not determine any penalties. The NOD included Form 886–A, which listed adjustments to charitable contributions by Duplin Land and stated: "This is the adjustment in accordance with the examination results of [Duplin Land's return]. Shown as information only." The corresponding adjustment reduced the Duplin Land charitable contributions from $2,064,282 claimed on the return down to $1,039. The NOD to Dell and Wendy Murphy did not assert liability for any penalty, nor did it determine to deny the charitable contribution deduction on the basis of their failure to satisfy the substantiation and reporting requirements of section 170(f)(11).

*Petitions and answers*

On June 24, 2016, each couple—Dell and Wendy Murphy and Wendell and Linda Murphy—timely filed a petition challenging the IRS's determination of a deficiency for 2010. The Commissioner's answers filed in August 2016 did not assert any liability for penalties. Rather, each answer alleged:

> [R]espondent is awaiting the delivery of various relevant administrative files. Further alleges that after a review of said administrative files, respondent may file an Amendment to his Answer which may include affirmative allegations in support of the determination that there is a gross valuation misstatement penalty under I.R.C. §§ 6662(e) and (h), or in the alternative, that there is an accuracy-related penalty under I.R.C. § 6662(a), with respect to the disallowance of the charitable deductions at issue in the instant case.

[*21] In his amended answers filed in September 2016, the Commissioner asserted—for the first time—gross valuation misstatement penalties under section 6662(e) and (h) or, in the alternative, accuracy-related penalties under section 6662(a). The Commissioner later conceded all penalties as to Dell and Wendy Murphy in Docket No. 14536-16.

Neither the Commissioner's answers nor his amended answers alleged noncompliance with the substantiation requirements of section 170(f)(11) to report in the return and attach to the return certain information with respect to the taxpayer's basis in the donated property and the appraisal thereof. Rather, the Commissioner first made this contention in his pretrial memorandum.

### *Trial of these cases*

These cases were consolidated for trial (along with Docket No. 8039-16), during which the parties offered expert reports and testimony regarding the values of the River Tract easement and the Landing Tract easement, as well as the ecological and recreational aspects of the River Tract easement and the Landing Tract easement. Additionally, the Murphy family testified regarding their businesses and the preparation of the tax returns in these cases.

### *The value of the donated easements*

In preparation for trial the Murphy family engaged Mr. Amos Franklin Dean to value the River Tract easement and the Landing Tract easement, and the Commissioner engaged Stephen Hughes to value the River Tract easement and the Landing Tract easement. After due consideration of the expert reports and testimony offered by both parties, and for the reasons explained below in Part IV.C, we find that the highest and best use of the River Tract before the easement donation was development of 172 lots, and that the corresponding value of the River Tract before the easement donation was $5,140,274. We find that after the easement donation, the highest and best use of the River Tract was continued use as a golf course (and development of zero lots), and that the value of the River Tract after the easement donation was $2,350,000. Therefore, we find that the value of the River Tract easement was $5,140,274 minus $2,350,000, or $2,790,274.

As to the Landing Tract, for the reasons explained below in Part IV.D, we find that the highest and best use before the easement donation was continued use as a golf course and development of 5 lots, and that

**[\*22]** the corresponding value of the Landing Tract before the easement donation was $2,550,000. We find that after the easement donation, the highest and best use of the Landing Tract was continued use as a golf course (and development of zero lots), and that the value of the Landing Tract after the easement donation was $2,450,000. Therefore, we find that the value of the Landing Tract easement was $2,550,000 minus $2,450,000, or $100,000.

## OPINION

I.     *Burden of proof and production*

A.     *The general rules*

1.     *Burden of proof under Rule 142*

Rule 142 provides that "[t]he burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court". Generally, the IRS's determinations in an NOD are presumed correct and the taxpayer bears the burden of proving them wrong. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933). Furthermore, taxpayers bear the burden of proving entitlement to deductions claimed. *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). The Murphys thus generally bear the burden of proving their entitlement to the charitable contribution deductions for qualified conservation contributions under the applicable provisions of section 170, *see* Rule 142(a), which includes proving that the donations of conservation easements on the River Tract and the Landing Tract satisfy the requirements of section 170(h) and that they obtained qualified appraisals under section 170(f)(11)(E), as well as the value of the respective easements. However, this general rule is subject to exceptions that affect the outcome of some issues in these cases, which we now discuss.

2.     *Burden of production under section 7491(c)*

Section 7491(c) provides that the Commissioner "shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount". That burden includes the obligation to show compliance with the requirement of section 6751(b)(1) that there be written supervisory approval of the "initial determination" of the penalty liability. The Commissioner made that showing, and petitioners make no contention

**[\*23]** as to any failure to comply with the procedural requirement of section 6751(b)(1).

As to the merits of the penalty liability, "to meet his burden of production, the Commissioner must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). "[O]nce the Commissioner meets his burden of production, the taxpayer must come forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect." *Id.* at 447. The Commissioner has met his burden of production as to penalties in these cases by asserting, on the basis of his valuation expert's report, that accuracy-related penalties under section 6662 are applicable, and though they stoutly oppose the penalties, petitioners do not dispute whether the Commissioner has met that threshold burden of production as to penalties.

### B. *The "new matter" exception*

The general rule that the taxpayer bears the burden of proof is subject to an exception that affects the outcome of some issues in these cases: Not the taxpayer but the Commissioner bears the burden of proof "in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Rule 142(a)(1).

#### 1. *The nature of "new matter"*

"A new theory that is presented to sustain a deficiency is treated as a new matter when it either [1] alters the original deficiency or [2] requires the presentation of different evidence. A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof." *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989) (citations omitted).

Since 1990 this "new matter" rule has been "supported by the statutory requirements of section 7522." *Shea v. Commissioner*, 112 T.C. 183, 197 (1999). In that year Congress added section 7522(a) to the Code to require NODs to "describe the basis for, and identify the amounts (if any) of, the tax due, interest, additional amounts, additions

[*24] to the tax, and assessable penalties included in such notice." Construing that provision, we held that

> where a notice of deficiency fails to describe the basis on which the Commissioner relies to support a deficiency determination and that basis requires the presentation of evidence that is different than that which would be necessary to resolve the determinations that were described in the notice of deficiency, the Commissioner will bear the burden of proof regarding the new basis.

*Shea*, 112 T.C. at 197.

### 2. *The "reasonable cause" defense as to penalty*

Under section 6664(c)(1), "No penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a *reasonable cause* for such portion and that the taxpayer acted in good faith with respect to such portion." (Emphasis added.) Where the Commissioner asserts a penalty for the first time as "new matter" in his answer and reasonable cause is at issue, his burden of proof on the imposition of that penalty includes showing the absence of "reasonable cause". *See, e.g.*, *RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1, 38–40 (2017), *aff'd sub nom. Blau v. Commissioner*, 924 F.3d 1261 (D.C. Cir. 2019); *Rader v. Commissioner*, 143 T.C. 376, 389 (2014), *aff'd in part*, 616 F. App'x 391 (10th Cir. 2015); *Arnold v. Commissioner*, T.C. Memo. 2003-259, 86 T.C.M. (CCH) 341, 344; *Collins v. Commissioner*, T.C. Memo. 1994-409, 68 T.C.M. (CCH) 484, 488; *Taylor v. Commissioner*, T.C. Memo. 1989-201, 57 T.C.M. (CCH) 276, 279–80; *Pickett v. Commissioner*, T.C. Memo. 1975-33, 34 T.C.M. (CCH) 213, 224; *Bruner Woolen Co. v. Commissioner*, 6 B.T.A. 881, 882 (1927).

In these cases, the NODs included no penalty determinations. Rather, it was in amended answers to the petitions in both cases that the Commissioner first asserted gross valuation misstatement penalties under section 6662(e) and (h), or in the alternative, accuracy-related penalties under section 6662(a). Because the penalties asserted by the Commissioner in his amended answers increase the liabilities above those originally determined in the NODs issued to the Murphys, the penalties are "new matter" for which the Commissioner bears the overall burden of proof. That burden includes the burden to show the absence

[*25] of "reasonable cause". *See Rader*, 143 T.C. at 389; *Arnold*, 86 T.C.M. (CCH) at 344; *Bruner Woolen Co.*, 6 B.T.A. at 882.

3. *The "reasonable cause" defense as to a "new matter" substantiation issue under section 170(f)(11)(A)(i)*

A second "reasonable cause" provision is also significant in these cases. As is explained below in greater detail in Part II.A, the Code has a demanding regime for substantiating charitable contribution deductions like the ones at issue here. Section 170(f)(11) and Treasury Regulation § 1.170A-13(c)(2)(i)(B) require that the taxpayer "[a]ttach a *fully completed* appraisal summary" (emphasis added) to his return, and that appraisal summary is to include "[t]he cost or other basis of the property". Treas. Reg. § 1.170A-13(c)(4)(ii)(E). If a donor fails to meet these requirements, then section 170(f)(11)(A)(i) provides that "no deduction shall be allowed".

However, there is an exception to this disallowance. Section 170(f)(11)(A)(ii)(II) provides that the taxpayer's deduction will not be disallowed "if it is shown that the failure to meet such requirements is due to reasonable cause and not to willful neglect"; and "reasonable cause" is, of course, the same phrase we mentioned in Part I.B.2 above in connection with penalties, where we showed that a shift in the burden of proof as to a penalty affects the burden of proof as to a "reasonable cause" defense to that penalty. This Court has not previously addressed explicitly the question of the burden of proof on the "reasonable cause" defense when the Commissioner raises the issue of noncompliance with section 170(f)(11) as "new matter" in litigation and reasonable cause for the noncompliance is at issue. But in *Belair Woods* we considered the relatedness of the section 170(f)(11)(A)(ii)(II) "reasonable cause" defense to the "reasonable cause" defense in the penalty context, and we concluded that the same standard—"ordinary business care and prudence", *United States v. Boyle*, 469 U.S. 241, 246 (1985) (quoting Treas. Reg. § 301.6651-1(c)(1))—should apply in both instances, *see Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, at *22–23 (first citing *Alli v. Commissioner*, T.C. Memo. 2014-15, at *60–61; and then citing *Crimi v. Commissioner*, T.C. Memo. 2013-51, at *98–99).

Consistent with that conclusion in *Belair Woods* that penalty principles properly inform our construction of "reasonable cause" under the substantiation provisions of section 170(f)(11)(A)(ii)(II), we hold that the determination of which party bears the burden of proof on

**[\*26]** reasonable cause under the substantiation provisions depends (as it does for penalty liability) on whether the Commissioner's contention of noncompliance with the substantiation provisions is new matter. If the Commissioner's contention about noncompliance with the substantiation requirements of section 170(f)(11) is new matter, then he bears the burden on that contention and on the "reasonable cause" defense to it—i.e., the Commissioner must prove the absence of reasonable cause.

This shift in the burden of proof occurs here. As we discuss below in Part II.B, the Commissioner argues that the Murphys' charitable contribution deductions should be entirely disallowed because of their failure to comply with the substantiation requirements of section 170(f)(11)(C) and Treasury Regulation § 1.170A-13(c)(2) and (4), since the Murphys did not attach a "fully completed appraisal summary" on Forms 8283 to their tax returns; and the Commissioner denies the existence of "reasonable cause" for that noncompliance under section 170(f)(11)(A)(ii)(II). The Commissioner first made this contention not in the NODs, not in his answers to the petitions nor in his amended answers, but rather in his pretrial memorandum. We conclude that compliance with the appraisal summary requirement of section 170(f)(11)(C) and Treasury Regulation § 1.170A-13(c)(2) and (4) was "new matter" at the trial of these cases; and we further conclude, guided by our penalty jurisprudence as we construe and apply the section 170(f)(11)(A)(ii)(II) reasonable cause defense, that the Commissioner's burden includes showing that the failure to fully complete the appraisal summary was not due to reasonable cause or was due to willful neglect. *See Belair Woods, LLC*, T.C. Memo. 2018-159, at \*22–23; *Alli*, T.C. Memo. 2014-15, at \*60–61; *Crimi*, T.C. Memo. 2013-51, at \*98–99.

The NOD issued to Wendell and Linda Murphy denied in its entirety the non-cash portion of the charitable contribution deduction passed through to them by Duplin Land. The NOD stated that it made that adjustment "in accordance with the examination results of the [Duplin Land] partnership return", but it did not state what the grounds were for that determination. Likewise, the NOD issued to Dell and Wendy Murphy denied in its entirety the non-cash portion of the charitable contribution deduction passed through to them by Duplin Land, but similarly did not state the grounds for that determination. Thus, both NODs adopt a determination made in the examination of Duplin Land's Form 1120–S to entirely disallow the charitable contribution deductions for the donations of the River Tract and the

[*27] Landing Tract easements; but, despite the Commissioner's allegations in his answers that he "is awaiting the delivery of the relevant administrative file that likely contains" the notice issued to Duplin Land, the notice issued to Duplin Land does not appear in the evidentiary record of these cases. We are therefore unable to determine the basis upon which the Commissioner disallowed Duplin Land's non-cash charitable contribution deductions by consulting any notice describing the results of the S corporation examination. We can, however, confidently infer the Commissioner's basis for disallowance from his answers in these cases.

Wendell and Linda Murphy's petition and Dell and Wendy Murphy's petition both state the following in paragraph 7(a) (with bracketed sentence numbers interpolated):

> [2] The Commissioner alleges that the Duplin Land Conservation Easements donated by Duplin Land, as reported on the Form 1120 S for Duplin Land for the Duplin Land Tax Year and supported by the appraisals by F. Bruce Sauter & Associates, Inc. attached to such Form 1120-S (the "Duplin Land Appraisals"), did not qualify under or otherwise fully satisfy the requirements of I R C. § 170(h) and the related Treasury Regulations. . . . [4] Although not set forth in the Notice Documents, it is understood that the determination by the Commissioner that the Duplin Land Conservation Easements failed to meet the requirements I.R.C. § 170(h) is based on that certain Form 886-A titled "Explanation of Items – Donation of Conservation Easement" prepared by R. Nixon, an employee of the Internal Revenue Service, with assistance from Gary McGurrin, Senior Appraiser with the Internal Revenue Service, for the respective examination ("Duplin Land Examination Report"). [5] Mr. Nixon and Mr. McGurrin concluded that Duplin Land did not provide a "qualified appraisal".

In his answers in both cases, the Commissioner "[a]dmits" the allegations in sentence 4 and "[a]dmits; denies error" the allegations in sentence 5.

Therefore, on the basis of the NODs issued to Wendell and Linda Murphy and to Dell and Wendy Murphy, as supplemented by the parties' pleadings, we hold that the NODs state, as the bases for their

**[\*28]** determinations to deny the full amounts of the charitable contribution deductions, two grounds—i.e., failure to meet the requirements of section 170(h) ("Qualified conservation contribution") and lack of qualified appraisals (as defined in section 170(f)(11)(E) and Treasury Regulation § 1.170A-13(c)(3))—and, as stated above, the Murphys bear the burden of proof on these issues. But section 170(f)(11)(E) and Treasury Regulation § 1.170A-13(c)(3) provide the rules for a "qualified appraisal", whereas the rules for an "appraisal *summary*" are in section 170(f)(11)(C) and Treasury Regulation § 1.170A-13(c)(4). A "qualified appraisal" and an "appraisal summary" are distinct documents that provide different information for different purposes. *Compare* Treas. Reg. § 1.170A-13(c)(3), *with* Treas. Reg. § 1.170A-13(c)(4). The Commissioner's appraisal summary contention therefore requires petitioners to present additional evidence beyond what would be required to rebut the determinations made in the NODs. For this reason, the Commissioner's appraisal summary contention is new matter for which he bears the overall burden of proof, including showing a lack of reasonable cause for the Murphys' noncompliance.

II. *The substantiation requirements of section 170(f)(11) and Treasury Regulation § 1.170A-13(c)*

A. *A description of the requirements*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If a taxpayer makes a charitable contribution of property other than money, then the amount of the contribution is the fair market value of the property at the time the contribution is made. *See* Treas. Reg. § 1.170A-1(c)(1). However, "[a] charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." § 170(a)(1).

Section 170(f)(11) imposes, for charitable contribution deductions, heightened substantiation requirements on taxpayers depending on the value of the contribution.[13] Section 170(f)(11)(A)(i) provides that "no

---

[13] In the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, § 155(a)(1) and (2), 98 Stat. 494, 691—an off-Code statutory provision—Congress directed the Secretary to issue regulations under section 170(a)(1) "which require any individual, closely held corporation, or personal service corporation claiming a deduction under section 170" greater than $5,000 to "obtain a qualified appraisal for the property contributed," "attach an appraisal summary to the return on which such deduction is first claimed for such contribution," and "include on such return such additional

**[\*29]** deduction shall be allowed . . . for any contribution of property for which a deduction of more than $500 is claimed unless such person meets the requirements of subparagraphs (B) [for deductions greater than $500], (C) [for deductions greater than $5,000], and (D) [for deductions greater than $500,000], as the case may be, with respect to such contribution." For contributions of $500 or more, a taxpayer must attach "a description of the property and such other information as the Secretary may require". § 170(f)(11)(B). For contributions of $5,000 or more, a taxpayer must also obtain "a qualified appraisal of such property" and attach to the return "such information regarding such property and such appraisal as the Secretary may require". § 170(f)(11)(C). Accordingly, Treasury Regulation § 1.170A-13(c)(2)(i) provides:

> [A] donor who claims or reports a deduction with respect to a charitable contribution to which this paragraph (c) [entitled "Deductions in excess of $5,000 for certain charitable contributions of property made after December 31, 1984"] applies must comply with the following three requirements:
>
> > (A) Obtain a qualified appraisal (as defined in paragraph (c)(3) of this section) for such property contributed. If the contributed property is a partial interest, the appraisal shall be of the partial interest.
> >
> > (B) Attach a fully completed appraisal summary (as defined in paragraph (c)(4) of this section) to the tax return (or, in the case of a donor that is a partnership or S corporation, the information return) on which the deduction for the

---

information (including the cost basis and acquisition date of the contributed property) as the Secretary may prescribe in such regulations." In response to DEFRA's directive, the Secretary added paragraph (c) to Treasury Regulation § 1.170A-13. But in the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 883(a), 118 Stat. 1418, 1631, Congress added paragraph (11) to subsection (f) of section 170 to "extend[] to all C corporations the present and prior law requirement, applicable to an individual, closely-held corporation, personal service corporation, partnership, or S corporation, that the donor must obtain a qualified appraisal of the property if the amount of the deduction claimed exceeds $5,000." Staff of J. Comm. On Taxation, 108th Cong., General Explanation of Tax Legislation Enacted in the 108th Congress, at 462 (Comm. Print 2005). "The Act also provide[d] that if the amount of the contribution of property . . . exceeds $500,000, then the donor (whether an individual, partnership, or corporation) must attach the qualified appraisal to the donor's tax return." *Id.*

**[\*30]**  contribution is first claimed (or reported) by the donor.

(C) Maintain records containing the information required by paragraph (b)(2)(ii) of this section.

Under Treasury Regulation § 1.170A-13(c)(4)(ii), the required appraisal summary must include, among other things, the following information: (1) the date the donor acquired the property; (2) the cost or other basis of the property; and (3) the date the donee received the property. Treas. Reg. § 1.170A-13(c)(4)(ii)(D), (E), (G). For contributions of $500,000 or more, a taxpayer must also attach the "qualified appraisal of such property" to the return. § 170(f)(11)(D). However, as is explained above in Part I.B.3, a taxpayer's deduction will not be disallowed for failure to comply with the heightened substantiation requirements of section 170(f)(11) "if it is shown that the failure to meet such requirements is due to reasonable cause and not to willful neglect." § 170(f)(11)(A)(ii)(II).

B. *Compliance with the requirements*

Because section 170(f)(11)(A)(i) entirely disallows a claimed charitable contribution deduction unless the taxpayer complies with its substantiation rules, we consider first whether petitioners met the substantiation requirements with respect to the easement donations at issue. We conclude that petitioners did not satisfy the substantiation requirements of section 170(f)(11) either strictly or substantially. (We then explain in Part II.C that their failure to do so should be excused for reasonable cause because the Commissioner failed to prove an absence of reasonable cause.)

1. *Strict compliance*

Although petitioners acknowledge that they did not report their cost basis in any of the donated easements on any of the Forms 8283 attached to their respective returns, as required by Treasury Regulation § 1.170A-13(c)(4)(ii)(E), they nonetheless insist that they strictly complied with section 170(f)(11)(C) because they provided their cost basis elsewhere (but nonetheless) "on such return" (quoting DEFRA § 155(a)(1)(C)). Specifically, petitioners assert that the IRS could have deduced Duplin Land's cost basis in the donated easements either by looking on Schedule L, "Balance Sheet per Books", at line 12, "Land (net of any amortization)", and subtracting the beginning of year amount from the end of year amount, or alternatively by looking at statement

[*31] 11 from Schedule M–1, "Reconciliation of Income (Loss) per Books With Income (Loss) per Return", and subtracting its reported values from the claimed charitable contribution amounts on Form 8283.

We rejected a similar argument in *Belair Woods*, T.C. Memo. 2018-159, at *19–20 (citations omitted), where we held:

> The regulations require that "an appraisal summary shall include" information concerning basis. The explicit disclosure of basis on Form 8283 is essential in alerting the Commissioner as to whether (and to what extent) further investigation is needed.
>
> The IRS reviews millions of returns each year for audit potential, and the disclosure of cost basis on the Form 8283 itself is necessary to make this process manageable. Revenue agents cannot be required to sift through dozens or hundreds of pages of complex returns looking for clues about what the taxpayer's cost basis might be.

Because section 170(f)(11)(C) and Treasury Regulation § 1.170A-13(c)(4)(i)(A) and (ii)(E) require that a donor's cost basis be reported on Form 8283, and all of petitioners' Forms 8283 left the donor's basis box blank, petitioners did not strictly comply with the reporting requirements of section 170(f)(11).

### 2. *Substantial compliance*

Thirty years ago we held in *Bond v. Commissioner*, 100 T.C. 32, 41–42 (1993), that some of the reporting requirements of Treasury Regulation § 1.170A-13(c) are "directory and not mandatory", so that a donor's failure to comply strictly with those requirements may be excused if the donor nonetheless demonstrates "substantial compliance". To determine whether a taxpayer has substantially complied with the reporting requirements of Treasury Regulation § 1.170A-13(c), we "consider whether [the taxpayers] provided sufficient information to permit [the IRS] to evaluate their reported contributions, as intended by Congress." *Smith v. Commissioner*, T.C. Memo. 2007-368, 94 T.C.M. (CCH) 574, 586 (first citing *Bond*, 100 T.C. 32; and then citing *Hewitt v. Commissioner*, 109 T.C. 258 (1997), *aff'd per curiam without published decision*, 116 F.3d 332 (4th Cir. 1998)), *aff'd*, 364 F. App'x 317 (9th Cir. 2009).

**[\*32]**  However, we observed in *RERI Holdings I*, 149 T.C. at 16–17:

> [B]ecause RERI's omission of its basis . . . from the Form 8283 it attached to its 2003 return prevented the appraisal summary from achieving its intended purpose, RERI's failure to meet the requirement of section 1.170A-13(c)(4)(ii)(E), Income Tax Regs., cannot be excused by substantial compliance.  As explained above, Congress directed the Secretary to adopt stricter substantiation requirements for charitable contributions to alert the Commissioner, in advance of audit, of potential overvaluations of contributed property and thereby deter taxpayers from claiming excessive deductions in the hope that they would not be audited.  S. Rpt. No. 98-169 (Vol. 1), *supra* at 444; 1984 Blue Book, *supra* at 503–504; *see also Hewitt v. Commissioner*, 109 T.C. at 264. . . .  Because RERI failed to provide sufficient information on its Form 8283 to permit respondent to evaluate its reported contribution, *cf. Smith v. Commissioner*, 2007 WL 4410771, at *19, we cannot excuse on substantial compliance grounds RERI's omission from that form of its basis . . . .  Therefore, RERI did not "[a]ttach a fully completed appraisal summary" to its 2003 return as required by section 1.170A-13(c)(2)(i)(B), Income Tax Regs.  Because RERI did not meet the substantiation requirements provided in section 1.170A-13(c)(2), Income Tax Regs., it is not entitled to any deduction under section 170 . . . .  *See* sec. 170(a)(1); sec. 1.170A-13(c)(1), Income Tax Regs.

To the same effect, we followed *RERI Holdings I* in *Belair Woods, LLC*, T.C. Memo. 2018-159, at *17, and determined:

> The requirement to disclose "cost or adjusted basis," when that information is reasonably obtainable, is necessary to facilitate the Commissioner's efficient identification of overvalued property. . . .  Unless the taxpayer complies with the regulatory requirement that he disclose his cost basis and the date and manner of acquiring the property, the Commissioner will be deprived of an essential tool that Congress intended him to have.

Therefore, under the reasoning set forth in *Belair Woods, LLC*, T.C. Memo. 2018-159, at *17–19, and *RERI Holdings I*, 149 T.C.

**[\*33]** at 16–17, there can be no substantial compliance with Treasury Regulation § 1.170A-13(c) where—as here—the taxpayer fails to disclose its cost or adjusted basis in the contributed property on Form 8283.  Because none of petitioners' Forms 8283 reported the cost basis in the contributed property, petitioners failed to substantially comply with the reporting requirements of Treasury Regulation § 1.170A-13(c), and their charitable contribution deductions must be disallowed unless their failure was "due to reasonable cause and not to willful neglect." *See* § 170(f)(11)(A)(ii)(II).

### C.  *Reasonable cause for noncompliance*

Section 170(f)(11)(A)(ii)(II) provides that the taxpayer's deduction will not be disallowed "if it is shown that the failure to meet such requirements is due to reasonable cause and not to willful neglect."[14]  As is noted above, we concluded in *Belair Woods, LLC*, T.C. Memo. 2018-159, at \*22–23, that the same standard—"ordinary business care and prudence", *Boyle*, 469 U.S. at 246 (quoting Treas. Reg. § 301.6651-1(c)(1))—should apply to both the reasonable cause defense in the penalty context, *see* § 6664(c)(1); Treas. Reg. § 1.6664-4, and the reasonable cause defense of section 170(f)(11)(A)(ii)(II).  On the basis of our allocation of the burden of proof above in Part I, the Commissioner must show that petitioners' failure to report cost basis in the donated properties on their Forms 8283 was not due to reasonable cause.

A frequent ground for claiming "reasonable cause"—and the ground under consideration here—is reliance on professional advice.

---

[14] As we explained in *Belair Woods, LLC*, T.C. Memo. 2018-159, at \*22–23, the statutory reasonable cause defense under section 170(f)(11)(A)(ii)(II) is broader than the regulatory reasonable cause defense under Treasury Regulation § 1.170A-13(c)(4)(iv)(C)(*1*), which provides:

> If a taxpayer has reasonable cause for being unable to provide the information required by paragraph (c)(4)(ii)(D) and (E) of this section (relating to the manner of acquisition and basis of the contributed property), an appropriate explanation should be attached to the appraisal summary.  The taxpayer's deduction will not be disallowed simply because of the inability (for reasonable cause) to provide these items of information.

Petitioners did not attach to their appraisal summaries any explanations for their failure to report cost basis nor do they assert reasonable cause under Treasury Regulation § 1.170A-13(c)(4)(iv)(C)(*1*).  Accordingly, we do not address reasonable cause under Treasury Regulation § 1.170A-13(c)(4)(iv)(C)(*1*) in this Opinion, and instead we consider only the statutory "reasonable cause" defense under section 170(f)(11)(A)(ii)(II).

**[\*34]** "Reliance on . . . professional advice . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."  Treas. Reg. § 1.6664-4(b)(1).  Instructed by Treasury Regulation § 1.6664-4(c), we have held that reasonable cause based on reliance on an advisor exists where (1) the advisor was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the advisor, and (3) the taxpayer actually relied in good faith on the advisor's judgment.  *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).  We now follow this penalty-context analysis in determining reasonable cause under section 170(f)(11)(A)(ii)(II); and we look to see whether the Commissioner—given his burden of proof on this new matter, *see supra* Part I.B.3—has shown that petitioners' omission of their bases from Form 8283 is not excused by their reliance on their advisors.

The straightforward and unchallenged trial testimony of Wayne Robbins (the Dixon Hughes partner who signed Duplin Land's Form 1120–S) established that petitioners' advisors, Dixon Hughes, was a well-known CPA firm with a good reputation in North Carolina, that petitioners retained Dixon Hughes to prepare all of their returns during a three-year period and relied on them to do so, that Dixon Hughes requested all information it thought necessary for preparing petitioners' returns, that Dixon Hughes received all the information that it requested from petitioners, that Dixon Hughes prepared the returns in accordance with that information, and that petitioners filed the returns as they had been prepared by Dixon Hughes.

That testimony seems to check all the boxes prescribed in *Neonatology Associates*.  However, Treasury Regulation § 1.6664-4(b)(1) provides that "[r]eliance on . . . the advice of a professional tax advisor or an appraiser does not necessarily demonstrate reasonable cause and good faith."  Paragraph (c)(1) further explains:

> In no event will a taxpayer be considered to have reasonably relied in good faith on advice (including an opinion) unless the requirements of this paragraph (c)(1) are satisfied.  The fact that these requirements are satisfied, however, will not necessarily establish that the taxpayer reasonably relied on the advice (including the opinion of a tax advisor) in good faith.

[*35] The subdivisions of paragraph (c)(1) thereafter provide the following requirements:

> (i) All facts and circumstances considered. The advice [upon which the taxpayer relies] must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. . . . In addition, the requirements of this paragraph (c)(1) are not satisfied if the taxpayer fails to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item.
>
> (ii) No unreasonable assumptions. The advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true . . . .
>
> (iii) Reliance on the invalidity of a regulation. A taxpayer may not rely on an opinion or advice that a regulation is invalid to establish that the taxpayer acted with reasonable cause and good faith unless the taxpayer adequately disclosed, in accordance with § 1.6662-3(c)(2), the position that the regulation in question is invalid.

Absence of reasonable cause could be demonstrated, notwithstanding reliance on an advisor, by showing that the taxpayer failed to comply with one or more of those requirements. We turn to the Commissioner's submissions to see whether he made such a showing.

In his pretrial memorandum (Doc. 57) and in his opening post-trial brief (Doc. 128), the Commissioner pointed out the failure of petitioners' Forms 8283 to state the donor's basis in the contributed property, but he made no allegation disputing "reasonable cause" for that failure. In his answering post-trial brief, the Commissioner's position about lack of "reasonable cause" is stated as follows:

> Dixon Hughes prepared Duplin Land's 2010 U.S. S Corporation Return (Form 1120–S) in accordance with the records provided to Dixon Hughes by petitioners. See

**[\*36]** Tr. 877:10-14.[15] The tax return preparers could not report the correct information on the Forms 8283 because the correct information was not provided to them by petitioners. For example, Duplin Land's 2010 Form 1120S failed to report a basis for either the River or Landing Tracts on the Forms 8283 attached, and reported a combined basis in the body of the return, without allocating basis for each property. Tr. 881:19-882:3;[16] Ex. 60–J [tax return]. Petitioners were in the best and perhaps only position to provide this information to their preparers. Petitioners have yet to indicate basis for each property separately. Entire record.

That is, the Commissioner argues that the Forms 8283 lacked the basis information not because the advisors had advised that it could or should be omitted but because petitioners declined to provide it to those advisors.

The cited evidence does not make this showing. There is simply no evidence as to whether the advisors *asked* for basis information. There is no evidence as to whether petitioners *provided* basis information—except that they manifestly *did* provide enough information to enable the advisors to know the "combined basis" which (as the Commissioner acknowledges) appears "in the body of the return". To the extent there was basis information not provided by petitioners, there is no evidence to show *why* they did not provide it. The reason that there is no such evidence is that the Commissioner did not cross-examine the witnesses on the point. Direct examination by petitioners' counsel included this exchange (Tr. 874):

---

[15] The cited transcript states the question: "From your conversations with the Murphys, what was your perception, as to whether the Murphys genuinely relied upon you and your firm to properly prepare these returns?" Mr. Robbins answered: "Well, I mean, we prepared their return entirely. I mean, it was—we would have reviewed their return just to make sure that it looks like that we had—there were no omissions, or whatever, but yes, they would have relied on us to take the data provided and prepare the return."

[16] In the cited transcript counsel stated, "directing your attention to . . . Bates number page 1754, . . . [t]hat 644,664 number is the combined basis of both charitable contributions made in 2010, correct?" Mr. Robbins answered, "Yes, that'd be one—that's just a combined number. That's right." Counsel asked, "But there were two charitable contributions?" He answered, "There were two, yes. There were. If you look on 8283, I think that's correct."

**[\*37]**
Q     ... In your dealings with the Murphys, through the preparation of the earlier returns and these returns, how responsive were they to providing you whatever information you and your firm requested?

A     They were very responsive. They had a very good staff there.

The Commissioner did not pursue the point—neither with the witnesses from the accounting firm nor with the petitioners. He now effectively asks us to draw a negative inference that petitioners deliberately withheld basis information from their advisors. Especially since he bears the burden of proof on this issue, we decline to do draw such an inference against petitioners.

The record thus lacks explicit evidence on whether the blank basis boxes on Forms 8283 were the result of Dixon Hughes' advice or were instead due to petitioners' willful neglect. If petitioners bore the burden to prove reasonable cause, then that lack of evidence might warrant the conclusion that their omission was not due to reasonable cause, because there is no evidence of any advice or judgment by the CPAs to omit cost basis in the donated property. However, in these cases the burden of proof is on the Commissioner to show a *lack* of reasonable cause for omission of cost basis on petitioners Forms 8283, because he raised this issue as new matter; and he must accordingly suffer the consequences of any gap in the record. Therefore, we hold that the Commissioner has failed to carry his burden to show a lack of reasonable cause, and that petitioners' omission of their cost bases in the donated properties on Forms 8283 will accordingly be excused for reasonable cause, so that we will not disallow their charitable contribution deductions for failure to comply with the reporting requirements of section 170(f)(11) and Treasury Regulation § 1.170A-13(c). We will instead now proceed to determine whether petitioners have proved entitlement to their charitable contribution deductions for "qualified conservation contributions" under the requirements of section 170(h).

III.    *Qualified conservation contributions under section 170(h)*

The Code generally restricts a taxpayer's charitable contribution deduction for donations of "an interest in property which consists of less than the taxpayer's entire interest in such property". § 170(f)(3)(A). That is, if someone owns property and donates to charity only a partial interest in that property, he may not claim a charitable contribution deduction for that donation. However, the statute provides an

**[*38]** exception—and allows a deduction—for a "qualified conservation contribution". § 170(f)(3)(B)(iii).

A. *The requirements for a "qualified conservation contribution"*

As we have noted, the general rule of section 170(f)(3) is that no deduction is allowed for a contribution of "less than the taxpayer's entire interest in donated property", but subsection (f)(3)(B)(iii) provides an exception for a "qualified conservation contribution". The definition of this term is given in section 170(h)(1), which provides:

> For purposes of subsection (f)(3)(B)(iii), the term "qualified conservation contribution" means a contribution—
> (A) of a qualified real property interest,
> (B) to a qualified organization,
> (C) exclusively for conservation purposes.

The Commissioner does not dispute that the deeds at issue granted easements that are "qualified real property interest[s]" as required by section 170(h)(1)(A) (and defined in section 170(h)(2)). And the parties have stipulated that NALT is a "qualified organization" as required by section 170(h)(1)(B) (and defined in section 170(h)(3)). Therefore, for the River Tract easement and the Landing Tract easement, we discuss only whether the donations of the easements were "exclusively for conservation purposes" as required by section 170(h)(1)(C) (and as defined in section 170(h)(4) and (5)).

B. *The parties' dispute as to conservation purpose*

  1. *The statute lists "conservation purpose[s]".*

"Conservation purpose" is defined in section 170(h)(4)(A), which provides:

> For the purposes of this subsection [i.e., section 170(h)], the term "conservation purpose" means—
> (i) the preservation of land areas for outdoor recreation by, or the education of, the general public,
> (ii) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem,
> (iii) the preservation of open space (including farmland and forest land) where such preservation is—

[*39]           (I) for the scenic enjoyment of the general
public, or
          (II) pursuant to a clearly delineated Federal,
State, or local governmental conservation policy,
and will yield a significant public benefit, or
          (iv) the preservation of an historically important
land area or a certified historic structure.

That is, the statute provides four potential qualifying purposes, the third of which ("preservation of open space") has two variants. "Under the statute, each of these four prongs is a conservation purpose in and of itself, and a taxpayer's satisfaction of one of these prongs suffices to establish the requisite conservation purpose." *Herman v. Commissioner*, T.C. Memo. 2009-205, 98 T.C.M. (CCH) 197, 200 (citing S. Rep. 96-1007, at 10 (1980), *as reprinted in* 1980-2 C.B. 599, 604).

### 2. *The deeds state "Conservation Purposes".*

The deeds at issue here grant, in identical wording, "a perpetual easement in gross over the Conservation Area for the purpose of preserving and protecting the Conservation Purposes." Each deed also states what those "Conservation Purposes" are, but they are not identical in the two deeds.

### a. *The River Tract easement deed*

The River Tract easement deed states ostensibly plural "Conservation Purposes" that amount to a single purpose, as follows:

> WHEREAS, preservation of the Conservation Area shall serve the following purposes pursuant to 26 U.S.C. § 170(h)(4)(a) and 26 CFR § 1.170A-14(d)(i), (the "Conservation Purposes"):

>> Preservation of the Conservation Area as a relatively natural habitat of fish, wildlife, or plants or similar ecosystem . . . .

"Preservation of . . . relatively natural habitat" is the conservation purpose approved in section 170(h)(4)(A)(ii). (No other purpose from section 170(h)(4)(A) is referred to in the "Conservation Purposes" of the River Tract easement deed.)

**[\*40]** Consistent with this "relatively natural habitat" purpose of the deed, a "Whereas" clause near the beginning of the River Tract easement deed lists "features of the Conservation Area having ecological significance (which may be hereinafter called the 'Conservation Values')", and those seven listed features all relate to the expressed "Conservation Purposes" of protecting a relatively natural habitat:

> WHEREAS, the features of the Conservation Area having ecological significance (which may be hereinafter called the "Conservation Values") and the Conservation Purposes have been established in the reports, plans, photographs, documentation, and exhibits assembled by, and retained in the offices of, North American Land Trust (collectively called the "Baseline Documentation"), pursuant to 26 CFR §170A-14(g)(5), which describes, among others, the following Conservation Values of the Conservation Area:
>
> > The Conservation Area provides wildlife corridors, breeding habitat, foraging habitat, and shelter for at least fifty species of animals; and
> >
> > The Conservation Area provides the natural ecological requirements for at least one hundred species of plants; and
> >
> > The Conservation Area supports one natural community: Coastal Plain Bottomland Hardwoods (Blackwater Subtype); and
> >
> > The Conservation Area contains wetlands that provide the adequate breeding habitat for obligate amphibians and invertebrate species; and
> >
> > The Conservation Area provides the natural ecological requirements and supports at least two animal Species of Special Concern in North Carolina: Eastern Fox Squirrel (*Sciurus niger*), and Bald Eagle (*Haliaeetus leucocephalus*); and
> >
> > The Conservation Area contains wetlands that hold and filter waters that drain into the Northeast Cape Fear River; and

[*41] Preservation of the Conservation Area provides suitable habitat for and supports 5 species of birds that are considered Species of Regional Importance as monitored by the Partners In Flight Species Assessment Database: Northern Flicker (*Colaptes auratus*), Pine Warbler (*Dendroica pinus*), Red Headed Woodpecker (*Melanerpes erythrocephalus*), Downy Woodpecker (*Picoides pubescens*), Brown Thrasher (*Toxostoma rufum*) . . . .

These "values" all pertain to species and their habitats (relevant to a purpose of "protection of a relatively natural habitat of fish, wildlife, or plants", under section 170(h)(4)(A)(ii)) (and not, as we stress below in Part III.B.3.c, to "preservation of open space").

b.    *The Landing Tract easement deed*

The Landing Tract easement deed states its "Conservation Purposes" as follows:

WHEREAS, preservation of the Conservation Area shall serve the following purposes pursuant to 26 U.S.C. § 170(h)(4)(a) and 26 CFR § 170A-14(d)(i), (the "Conservation Purposes"):

Preservation of the Conservation Area for outdoor recreation by, or the education of, the general public; and

Preservation of the Conservation Area as open space which provides scenic enjoyment to the general public and yields a significant public benefit; and

Preservation of the Conservation Area as open space which, if preserved, will advance a clearly delineated Federal, State or local governmental conservation policy and will yield a significant public benefit . . . .

These are the "outdoor recreation" and "open space" purposes approved in section 170(h)(4)(A)(i) and (iii). (No other purpose from section 170(h)(4)(A) is referred to in the "Conservation Purposes" of the Landing Tract easement deed.)

**[\*42]**    3.    *We consider only a conservation purpose that is stated in the deed.*

The River Tract easement deed and the Landing Tract easement deed state their intended conservation purposes. As we have shown, the River Tract easement deed states one purpose (i.e., "[p]reservation of . . . a relatively natural habitat") and the Landing Tract easement deed states, depending on how they are counted, two purposes (i.e., "preservation . . . for outdoor recreation" and both variants of "[p]reservation . . . as open space"). But despite the explicit statement of the conservation purposes in the deeds (and the implicit exclusion of other potential but unstated conservation purposes), petitioners argue that the River Tract easement deed and the Landing Tract easement deed satisfy multiple conservation purposes listed in section 170(h)(4)(A) because "the premises section in the River and Landing Conservation Deeds refer to a laudable set of wildlife and open space conservation values, purposes, and goals" and "[t]hose premises shed light on the meaning of the operative provisions which fulfill the statutory conservation values and purposes protected by those operative terms." The Commissioner, on the other hand, argues "that the conservation purposes listed in the deed are what matters for meeting conservation purpose." We agree with the Commissioner and disregard alleged purposes not stated as such, for the following reasons:

a.    *Section 170 requires a "real property interest".*

Section 170(h)(1)(A) grants a deduction only for a contribution of a "real property interest". The donee must receive a property right; and when a donee has received a property right under an easement, the donee can assert that right against an owner who violates it, and the courts will enforce that right in favor of the donee.

No deduction is allowed to a taxpayer who simply shares laudable purposes and goals with a conservancy; a deduction is allowed only when a deed confers a *right* to restrict the use of the property. If the "premises section" of the deed describes goals that are not reflected in the rights actually conveyed in the deed, then those premises do not carry the day. As we show below, the "Conservation Purposes" are defined completely differently in the two deeds at issue here. If we were to construe them the same, then we would render null what was supposed to be the operative wording of the instruments.

**[\*43]**    b.    *Caselaw directs us to consider the stated purpose.*

Our prior conservation easement cases which have reached the conservation purpose question have considered whether the easement achieved a conservation purpose stated in the deed. *See, e.g.*, *PBBM-Rose Hill, Ltd. v. Commissioner*, 900 F.3d 193, 202 (5th Cir. 2018); *Turner v. Commissioner*, 126 T.C. 299, 309, 313–17 (2006); *Champions Retreat*, T.C. Memo. 2018-146, at \*7–8, \*22; *Atkinson v. Commissioner*, T.C. Memo. 2015-236, at \*7, \*24–56.[17]   Rather than considering alternative arguments presented to preserve a claimed charitable contribution deduction after it has been challenged by the Commissioner and has become the subject of litigation, we will consider only whether the River Tract easement and the Landing Tract easement achieve the "Conservation Purposes" that are stated in their deeds.

c.    *The River Tract easement deed does not state an "open space" purpose.*

Although "relatively natural habitat" is the only conservation purpose stated in the deed, petitioners contend that in addition to that express purpose, the River Tract easement deed also stated multiple additional conservation purposes, including in particular "open space". Petitioners' brief asserts:

> [T]he premises in the River Conservation Deed cite "relatively natural habitat" and state the intent to perpetually protect "open space" (Ex. 12-J at B-187):

---

[17] Our opinion in *Glass v. Commissioner*, 124 T.C. 258, 268, 270–71 (2005), *aff'd*, 471 F.3d 698 (6th Cir. 2006), involved two deeds, each of which had a lengthy "purpose" clause that used the general phrase "natural resource values". The taxpayer argued, inter alia, that the easements "protect[ed] a relatively natural habitat", *id.* at 280; the Commissioner argued that the easement failed to achieve that purpose (but he evidently did not argue that the deeds failed to *state* that purpose); and we held "that petitioners have proven that their contributions of the conservation easements were for a conservation purpose under . . . section 170(h)(4)(A)(ii)" (i.e., "relatively natural habitat"), *id.* at 282. The deeds in *Glass* also included prefatory text stating that the taxpayer and the donee "recognize the scenic and natural resource values . . . and share the common intention to preserve these values", *id.* at 268, 270; but our opinion did not rely on the statement of a "common intention". Unlike *Glass*, in which the stated "purpose" we construed was general, these cases involve deeds that expressly define their "Conservation Purposes" in wording taken verbatim from the statute and regulations.

**[\*44]**  WHEREAS, Owner and Holder desire to perpetually conserve the natural, scientific, educational, open space, scenic and historical resources of the Conservation Area . . . .

To use this "Whereas" reference of "desire" as a basis for construing "open space" as an enforceable "conservation purpose" of the River tract easement deed, petitioners cite N.C. Gen. Stat. § 39-1.1(a) (1967), which provides that "[i]n construing a conveyance executed after January 1, 1968, in which there are inconsistent clauses, the courts shall determine the effect of the instrument on the basis of the intent of the parties as it appears from all of the provisions of the instrument." Petitioners rely on this North Carolina statute to argue that Duplin Land's and NALT's stated mutual desire "to perpetually conserve the . . . open space . . . of the Conservation Area" means that the River Tract easement deed intended the preservation of open space as a conservation purpose pursuant to section 170(h)(4)(A)(iii).

However, the River Tract easement deed has no ambiguity or inconsistent clauses as to the conservation purpose of the River Tract easement that would cause us to consider the parties' intent under N.C. Gen. Stat. § 39-1.1(a).[18] Petitioners' argument (as quoted above) omits key text from the "Whereas" clause that it cites, which reads in its entirety:

WHEREAS, Owner and Holder desire to perpetually conserve the natural, scientific, educational, open space, scenic and historical resources of the Conservation Area *to accomplish the Conservation Purposes.*

(Emphasis added.) In this clause, the "desire" for "open space" is expressed as a means "to accomplish the Conservation Purposes"; and though conservation of open space is a stated "desire" of the parties, it is not a stated purpose for which the easement is said to be granted. Rather, "Conservation Purposes" is an expressly defined term in the River Tract easement deed, and it is defined therein to mean

---

[18] Furthermore, whether the River Tract easement deed satisfies a conservation purpose or was granted exclusively for conservation purposes under the relevant provisions of section 170(h) such that it would be eligible for a charitable contribution deduction for federal income tax purposes is ultimately a question of federal law, even though state law creates and governs the nature of interests in property (and in these cases, the interpretation of property conveyances). *See RP Golf, LLC v. Commissioner*, T.C. Memo. 2016-80, at \*17, *aff'd*, 860 F.3d 1096 (8th Cir. 2017).

**[\*45]** "[p]reservation of the Conservation Area *as a relatively natural habitat* of fish, wildlife, or plants or similar ecosystem" (using the text of section 170(h)(4)(A)(ii)), and not "preservation of open space" (as in section 170(h)(4)(A)(iii)). The premises section of the River Tract easement deed thus states that the "desire to perpetually conserve the natural, scientific, educational, open space, scenic and historical resources of the Conservation Area" is an anticipated means "to accomplish" the "[p]reservation of the Conservation Area as a relatively natural habitat of fish, wildlife, or plants or similar ecosystem". But it does not state that "open space" is one of the purposes for which it grants the easement to NALT.

It is clear that NALT itself, the donee, did not think that "open space" was one of the purposes for which it had been granted the River Tract easement. The River Baseline Report prepared by NALT states the following regarding the "Conservation Purpose" of the River Tract easement:

> In particular, the River Conservation Area satisfies one (1) Conservation Purpose:
>
> > 1. *Preservation of the Conservation Area as a relatively natural habitat of fish, wildlife, or plants or similar ecosystem; and* [sic]
>
> While not specified in the River Conservation Easement document as a supporting Conservation Purpose, another Purpose that could have been considered is *scenic enjoyment to the general public*. As demonstrated in the Supportive Mapping, the Conservation Area can be viewed from the North Cape Fear River.

That is, NALT's River Baseline Report observes that preservation of open space for the scenic enjoyment of the general public "could have been considered", but states very explicitly that the River Tract easement deed "satisfies one (1) Conservation Purpose", namely, preserving a relatively natural habitat. It is clear that "open space" was in fact not contemporaneously considered as a conservation purpose by Duplin Land and NALT before the donation of the River Tract easement.

It must be noted that the additional terms in this "desire" text of the "Whereas" clause are not limited to "open space" but also state a "desire to perpetually conserve the . . . historical resources of the Conservation Area". Petitioners' hermeneutic that supports their

**[*46]** discerning an "open space" purpose for the River Tract easement could just as well support a "historical resources" purpose (a construction that petitioners do not acknowledge). This reading of the River Tract easement deed would supposedly entitle NALT to object not only to use of the property that interfered with the relatively natural habitat *or* open space but also to use that interfered with "historical resources". It is difficult to imagine a court sustaining any "open space" or "historical resources" objection by NALT, given the statement of only one purpose in the River Tract easement deed and given NALT's contemporaneous acknowledgement of only one purpose—"relatively natural habitat".

Accordingly, we will evaluate only whether the River Tract easement deed "protect[s] . . . a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem" within the meaning of section 170(h)(4)(A)(ii) and Treasury Regulation § 1.170A-14(d)(3).

        d.     *The Landing Tract deed does not state a "relatively natural habitat" purpose.*

As we demonstrated above in Part III.B.2.b, the Landing Tract easement deed states conservation purposes of preservation (1) for outdoor recreation, (2) as open space providing scenic enjoyment to the public, and (3) as open space to advance a government policy—and no others. Nonetheless, petitioners argue that the Landing Tract easement deed "fulfills" an additional purpose: i.e., "[p]reservation of a relatively natural habitat for plants or wildlife". As we explained above, petitioner argued for an unstated purpose in the River Tract easement deed by quoting text that describes a mutual "desire". Petitioners point to no such "desire" text in the Landing Tract easement deed but instead to "restrictions in Article 2 . . . and the limitations on the reserved rights in Article 3". That is, petitioners evidently contend not that a "relatively natural habitat" purpose is provided or mentioned in the Landing Tract easement deed but that it has an *effect* of protecting a relatively natural habitat.

That argument is defeated both by the actual "Conservation Purposes" provision in the Landing Tract easement deed and by the Landing Baseline Report prepared by the donee, NALT. That report states the same three "Conservation Purposes" that are stated in the Landing Tract easement deed itself:

**[*47]** In particular, the [Landing] Conservation Area satisfies three (3) Conservation Purposes:

> 1. *Preservation of the Conservation Area for outdoor recreation by, or the education of, the general public; and*

> 2. *Preservation of the Conservation Area as open space which provides scenic enjoyment to the general public and yields a significant public benefit; and*

> 3. *Preservation of the Conservation Area as open space which, if preserved, will advance a clearly delineated Federal, State or local governmental conservation policy and will yield a significant public benefit.*

The Landing Baseline Report does not state that any other conservation purpose could have been considered.

The Landing Tract easement deed does recite "Conservation Values" that overlap with those of the River Tract easement deed,[19] and those values do relate to the River Tract easement deed's "relatively natural habitat" purpose. However, those "Conservation Values" do not correspond to the conservation purposes stated in the Landing Tract easement deed. Given the express purposes stated in the Landing Tract easement deed and NALT's explicit affirmation of those purposes (and no others), we decline to infer from the "Conservation Values" in the Landing Tract easement deed that the parties intended an unstated purpose of protecting a relatively natural habitat. The generally stated "Conservation Values" concerning the ecological aspects of the Landing Tract easement must yield to the specifically enumerated conservation purposes in the Landing Tract easement deed and in the Landing Baseline Report. *See PBBM-Rose Hill, Ltd. v. Commissioner*, 900 F.3d at 204 ("[W]e give greater weight to the deed's specific terms in paragraph 2.4.1 than its general language in paragraph 6.14" (citing Restatement (Second) of Contracts § 203(c) (Am. Law Inst. 1981))). Therefore, as with the River Tract easement, we will evaluate only

---

[19] Two of the seven "Conservation Values" listed in the River Tract easement deed, i.e., the third and the sixth, are omitted from those values as stated in the Landing Tract easement deed. From the fifth value stated on the River Tract easement deed, the lending deed omits mention of the bald eagle.

**[*48]** whether the Landing Tract easement satisfies a conservation purpose stated in the Landing Tract easement deed.

4. *The River Tract easement does protect "a relatively natural habitat".*

a. *"Natural" and "relatively natural"*

The dictionary defines the word "natural" as "of or arising from nature; in accordance with what is found or expected in nature"; "produced or existing in nature; not artificial or manufactured"; "in a state provided by nature, without man-made changes; wild; uncultivated". *Natural, Webster's New World College Dictionary* (4th ed. 2008).[20] The proposition that a golf course is *not* "natural" can be easily defended: A golf course is, in fact, highly artificial. Where nature had planted a field or forest, man imports a ground cover that is different from nature's choice. Diligent, persistent human work is required, using elaborate mechanical and chemical means, to keep nature at bay—both plant life and animal life—and to maintain a surface on which a golf ball will roll. Asphalt paths are laid down to facilitate human foot traffic and cart traffic, and structures—such as club houses with amenities like restaurants, shops, and concessions—are built to support the human activity. If one's principal goal were to find a *natural* habitat for rare, endangered, or threatened species of animals, fish, or plants, one would not first visit a golf course.

However, Congress did not determine to incentivize only the preservation of "natural" areas but rather to allow a charitable contribution deduction for the donation of an easement that has, as its "conservation purpose", "the protection of a *relatively natural* habitat of fish, wildlife, or plants, or similar ecosystem". § 170(h)(4)(A)(ii) (emphasis added). Thus, the statutory term we construe and apply is not just "natural" but "relatively natural". Consequently, the outcome of these cases does not depend on whether the golf course itself is a "natural area" (it is not)[21] but on whether petitioners' contribution

---

[20] In Webster's Third New International Dictionary of the English Language, Unabridged (2002), the relevant sense of the word "Natural" is elaborated as "planted or growing by itself: not cultivated or introduced artificially" or "existing in or produced by nature . . . not artificial".

[21] *Cf. Champions Retreat*, T.C. Memo. 2018-146, at *23, *28 ("we do not find the [golf course] easement area to be a natural area").

**[\*49]** protects a "*relatively* natural habitat". To construe this statute we must distinguish these terms.

#### b. *Distinguishing the two terms*

The added word—"relatively"—means "not absolutely". *Relatively, Webster's Third New International Dictionary of the English Language, Unabridged* (2002). Unless "relatively" is, in the words of H.W. Fowler, being used here simply to "water down" the adjective "natural", it is a word that "can properly be used only when some comparison is expressed or implied",[22] so the phrase "relatively natural" prompts the question "Relative to what?" A "relatively tall tree" in a redwood forest would be much taller than a "relatively tall tree" in an apple orchard. A habitat that failed to be "relatively natural" compared to untouched wilderness might nonetheless seem remarkably "natural" compared to a strip mine. A golf course set in a forested area and maintained according to "best environmental practices" might be "relatively natural" compared to an urban golf course under normal maintenance. We need to know what comparison is expressed or implied.

The statute itself gives not much help, since the only use of "natural" in all of section 170 (which is well over 10,000 words long) is in our phrase "relatively natural" in subsection (h)(4)(A)(ii). However, we do find the word "natural" in the regulations, which refer to—

> *natural areas* that represent high quality examples of a terrestrial community or aquatic community, such as islands that are undeveloped or not intensely developed where the coastal ecosystem is relatively intact; and *natural areas* which are included in, or which contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area.

Treas. Reg. § 1.170A-14(d)(3)(ii) (emphasis added). By this description, even "natural areas"[23] may evidently be to some extent developed (just

---

[22] *See* H.W. Fowler, *Modern English Usage* 99 (2d ed. 1965) ("Timid writers who shrink from positive statements have a bad habit of using . . . *relatively* to water down their adjectives and adverbs, forgetting that [*relatively*] can properly be used only when some comparison is expressed or implied").

[23] Petitioners do not contend that the easement protected habitats in "natural areas" within the meaning of Treasury Regulation § 1.170A-14(d)(3)(ii).

**[\*50]** not "*intensely* developed") and may have ecosystems that are not pristine (but are "*relatively* intact"). *Id.* (emphasis added). Such a "natural area" may be a full-blown "wilderness area", but (the regulation indicates) it may also be "included in . . . a local, state, or national park"—areas that sometimes include trails (sometimes paved), ski slopes and other recreational facilities, campgrounds (sometimes with sanitary facilities), cabins, and even hotels.[24] Thus, "natural" does not necessarily mean untouched by human hands and feet but can refer to areas somewhat altered by human activity; and "relatively natural" refers to areas that may be even more altered but still retain conservation value—in this instance, the ability to serve as habitat for rare, endangered, or threatened species.

### c. *Habitat*

The noun in our phrase is "habitat". As the Eleventh Circuit observed in *Champions Retreat v. Commissioner*, 959 F.3d at 1038: "What matters under the Code and regulation is not so much whether all the *land* is natural, but whether the *habitat* is natural." We have previously construed "habitat" to mean "'[t]he area or environment where an organism or ecological community normally lives or occurs' or '[t]he place where a person or thing is most likely to be found'" and have construed "community" as "[a] group of plants and animals living and interacting with one another in a specific region under relatively similar environmental conditions." *Glass*, 124 T.C. at 281–82 (quoting *Community*, *Habitat*, *American Heritage Dictionary of the English Language* (4th ed. 2000)).

Commentary on the phrase "relatively natural habitat" from section 170(h)(4)(A)(ii) is given in Treasury Regulation § 1.170A-14(d)(3)(i), which provides:

> The donation of a qualified real property interest to protect a *significant* relatively natural habitat in which a fish,

---

[24] *See* 16 U.S.C. § 497b (granting the National Forest Service the power to approve ski permits on federal conservation land); 36 C.F.R. § 2.10(a) (granting the Department of the Interior superintendent the power to establish camp sites); 36 C.F.R. § 2.19 (governing winter activities on federal recreation land); 36 C.F.R. § 5.10 (providing for private lodging establishments on federal conservation/recreation land by permit); 43 C.F.R. § 21.3(d) (definition of "cabin site" for cabins located on federal conservation/recreation land); 43 C.F.R. § 8360.0-5(c) (defining "developed recreation sites and areas"); 43 C.F.R. §§ 8365 et seq. (rules of conduct for patrons of public recreation land).

**[\*51]** wildlife, or plant community, or similar ecosystem normally lives will meet the conservation purposes test of this section. The fact that the habitat or environment has been altered to some extent by human activity will not result in a deduction being denied under this section if the fish, wildlife, or plants continue to exist there in a relatively natural state.

(Emphasis added.) In *Champions Retreat v. Commissioner,* 959 F.3d at 1036, the Eleventh Circuit observed the "relatively natural habitat" text in section 170(h)(4)(A)(ii) and the "significant relatively natural habitat" text in Treasury Regulation § 1.170A-14(d)(3)(i) and stated as follows:

> [E]ven without the regulation, the Code would not be construed to apply to a completely trivial habitat—a few commonly occurring ants plainly would not do, nor would many other species not in need of conservation. Requiring some level of significance thus is unobjectionable. So long as the regulation's use of this term is not construed to mean more than the Code will support, there is no reason to doubt the regulation's validity.

Treasury Regulation § 1.170A-14(d)(3)(ii) provides the following standards for discerning what constitutes a significant habitat (with bracketed numbers interpolated):

> Significant habitats and ecosystems include, but are not limited to, [1] habitats for rare, endangered, or threatened species of animals, fish, or plants; [2] natural areas that represent high quality examples of a terrestrial community or aquatic community, such as islands that are undeveloped or not intensely developed where the coastal ecosystem is relatively intact; and [3] natural areas which are included in, or which contribute to, the ecological viability of a local, state, or national park, nature preserve, wildlife refuge, wilderness area, or other similar conservation area.

Petitioners do not argue that the easements constitute "natural areas" as in the second and third of these examples. Rather, relying on the first example (which echoes the text of section 170(h)(4)(A)(ii)), they argue that the presence of rare plant and animal species in the River

[*52] Tract easement shows that it provides a "habitat[] for rare, endangered, or threatened species of animals, fish, or plants". The broad wording of the regulation—"include, but are not limited to"—shows that these examples should not be strictly construed; and we have expressly held "that 'rare, endangered, or threatened', which is undefined in the regulations, should not be limited to species listed under the Endangered Species Act of 1973 . . . (codified as amended at 16 U.S.C. sec. 1533 (2012))." *Champions Retreat v. Commissioner*, T.C. Memo. 2018-146, at *24. Consistent with that holding, the Eleventh Circuit has construed this standard as "distinguish[ing] species that reasonably warrant protection, on the one hand, from commonly occurring species for which the loss of habitat is not of significant concern." *Champions Retreat v. Commissioner*, 959 F.3d at 1036.

### d. *Analysis*

In *Champions Retreat*, T.C. Memo. 2018-146, at *12–13, we held that the presence of a squirrel species, a plant (denseflower knotweed), and 11 bird species "of conservation concern" (in addition to many other bird species) did not warrant a finding of "relatively natural habitat of . . . wildlife, or plants".[25]  In these cases the observed species of conservation concern in the River Tract easement area were substantially more numerous than those in *Champions Retreat*. The star of this show was the American Bald Eagle, recounted in the River Baseline Report before the donation of the River Tract easement in December 2010, along with the less famous Eastern Fox Squirrel; but both are "[r]are and uncommon species observed on the property". The River Baseline Report also recounted that the Northern Flicker, Pine Warbler, Red Headed Woodpecker, Downy Woodpecker, and Brown Thrasher (each considered a Species of Regional Importance according to the Partners in Flight Species Assessment Database) "were observed foraging and roosting in the easement area."

Petitioners supplement the observations in the River Baseline Report with two expert reports containing wildlife surveys conducted on

---

[25] The Eleventh Circuit—the probable but perhaps not inevitable venue for an appeal of these cases, *see supra* note 3—took a more permissive approach, held that "the presence of these many species, including some of substantial conservation concern, shows that the property is a significant habitat for 'rare, endangered, or threatened species'", and vacated our decision. *Champions Retreat v. Commissioner*, 959 F.3d at 1037.  Since the facts we find here make these cases distinguishable from *Champions Retreat*, *see infra* note 29, we need not reconsider in these cases our holding in *Champions Retreat* in light of the Eleventh Circuit's reversal.

**[\*53]** the River Tract easement in 2018[26] (one prepared by NALT and the other prepared by Ms. Heather Wallace, an Environmental Project Manager for Calyx Engineers + Consultants). NALT's report contains "an avian survey, a botanical survey, and a bat audio survey" of the River Tract easement that found 16 bird species of special concern (excluding potential migratory species). It reported an area that it described as "a globally imperiled variant of the blackwater cypress-gum swamp ecological association . . . termed the Atlantic Coastal Plain Blackwater Cove Woodland", detected the presence of "the Tri-colored bat (Perymyotis subflavus) that has been experiencing dramatic population declines", and confirmed that the River Tract easement habitat is common for the American alligator (whose presence on the River Tract easement has been confirmed in photographs taken by residents of River Landing and included in NALT's report) and a repeat appearance of the American Bald Eagle (which had been observed eight years earlier). NALT's report concludes that "[t]he River Conservation Area . . . provides important habitat to species that have been classified as rare, special concern, and regional importance" and that "[w]ithout the . . . River conservation deeds to protect these diverse species, residential or commercial development would destroy their habitat."

Ms. Wallace's report observed "[t]hirty-two (32) rare species, as listed in 2018 by the U.S. Fish & Wildlife Service, North Carolina Wildlife Resources Commission, North Carolina Natural Heritage Program, NatureServe, Partners in Flight, and National Audubon Society. Twenty-six (26) of these species appeared on the rare species lists prepared by these conservation organizations in 2010." Altogether, Ms. Wallace observed 25 rare species of bird, 1 rare species of insect, and 6 rare species of mammals.

The Commissioner, however, insists that "[t]he golf courses, which are the majority of the easement areas, are not the relatively natural habitat for any animal". He states (correctly) that "[g]olf courses are highly managed areas that often deplete water supplies, contain

---

[26] The experts' reports upon which both parties rely for their contentions as to whether the River Tract easement provides a relatively natural habitat reflect the state of the River Tract easement in 2018—eight years after donation of the River Tract easement in 2010—and accordingly interpret the qualities of the River Tract easement with the benefit of hindsight. Neither side objects to the other's use of 2018 data, and we will therefore rely on the 2018 data in reaching our conclusion. Although an appraisal based on 2018 data might not be appropriate for determining a 2010 value, we think 2018 wildlife data may be useful to show the extent to which perpetual restrictions imposed in 2010 are yielding their projected consequences.

**[*54]** non-native grasses, shrubs and sometimes trees, and utilize pesticides, fertilizers, and herbicides as well as fungicides to maintain the manicured nature of the main playing area of the course." He relies on the admittedly credible expert report of Dr. Curtis J. Richardson, of Richardsons Ecological Consulting (Specializing in Wetland Ecology, Restoration, Conservation and Ecosystem Service Analysis), who "proceeded with a full field investigation of the [River Tract easement] site on September 27–28th 2017." Dr. Richardson performed a full field investigation, which surveyed the soils, water quality, vegetation, and ecological landscape on both the golf course and the surrounding area. Dr. Richardson made detailed findings about the disturbance of the pre-existing habitat,[27] the reduced diversity of species on the golf course and the absence of certain threatened species (compared to nearby natural habitat), the presence of non-native plant species, the use of chemicals and the alteration of soil and water chemistry, and the proximity of residences. He summarized his findings as follows:

> [M]y analysis of the regional ecological information, and the ecological status of the River Golf Course CA [conservation area], found during the September 2017 site visit, shows a considerably altered environmental condition compared to native habitats found at nearby Angola Bay [Game Lands] and the Cape Fear River Basin. In fact Duplin and nearby Pender county already have the luxury of having Angola Bay as a vast wildlife refuge and conservation area. Collectively, my review of background materials, land use and golf documents, USDA and USFWS classifications of soils and wetlands as well as my field studies and analysis confirms that the River Golf Course CA does not have the ecological capacity to serve and protect relatively natural habitat in which fish, wildlife and plant communities live and ecosystem services function.

However, Dr. Richardson's findings confirm that the River Tract easement comprises not only River golf course areas (which contain modified features and provide admittedly modest ecological value) but also forested areas (which more nearly resemble the natural state of the wetland habitat and provide a higher degree of ecological value)—and

---

[27] Dr. Richardson observed that "more than 50% of land in the Proposed River Conservation Easement request is comprised of the golf course tees, fairways, greens, rough etc. The percentage that is in woodlands or partially disturbed habitat is 33%".

[*55] Dr. Richardson acknowledges that those forested areas constitute approximately one-third of the River Tract easement area. Although Dr. Richardson's report focuses more heavily on the modified features of the River golf course portions of the River Tract easement (comparing them unfavorably to the natural state of the adjacent Angola Bay and Cape Fear River Basin conservation areas), his observations are actually not inconsistent with NALT's and Ms. Wallace's findings as to the presence of rare species on the River Tract easement. Dr. Richardson did not himself conduct any wildlife surveys on the River Tract easement, and he neither disagreed with nor cast doubt upon the findings in NALT's and Ms. Wallace's reports.

We do not resist Dr. Richardson's descriptions of the manner in which the golf course altered the environment when it was built. But Treasury Regulation § 1.170A-14(d)(3)(i) provides that "[t]he fact that the habitat or environment has been altered to some extent by human activity will not result in a deduction being denied under this section if the fish, wildlife, or plants continue to exist there in a relatively natural state", and we are persuaded that such species do so exist in the River Tract easement area. Nor do we resist Dr. Richardson's conclusions about the respects in which the River Tract easement is inferior to the nearby conservation areas to which he compares it. It seems that those other areas might constitute "natural areas" within the meaning of Treasury Regulation § 1.170A-14(d)(3)(ii); and, if they do, it is no insult to their conservation value to observe that, even if they are "natural areas", they may to some extent be inferior to actual wilderness areas.[28] Moreover, the main relevance of the nearby conservation areas is not any bad light that they might cast on the River Tract easement; on the contrary, as Ms. Wallace observed, the River Tract easement is "in close proximity to and contribute[s] to the ecological viability of Angola Bay Game Land". Someone (like NALT) who was interested in protecting Angola Bay would certainly prefer that it be bordered by the River Tract easement area rather than be bordered by an unrestricted housing development, so the conservation value of the River Tract easement is enhanced, not denigrated, by its proximity to superior conservation areas.

---

[28] Angola Bay's map shows a "Restricted Firearms Zone", a "Restricted Deer Hunting Zone", a "Boating Access Area", a "Public Parking" area, a "Designated Hunter Camping Area", an "Observation Deck", a "Disabled Hunter Access", a "WRC Managed Shooting Range", "Hunter Access", a "Disabled Sportsman Road", "4WD Hunter Access", "Trail", "Waterfowl Blind", "Disabled Sportsman Access Blind", a "Gate", a "Seasonally Closed Gate", and a "Scouting Area".

**[\*56]** These distinctions—a true wilderness area, a potentially less protected "natural area", and an even less protected "relatively natural habitat"—are certainly relevant to determining the conservation values that these areas possess. But the statute does not restrict the charitable contribution deduction to an easement that protects a wilderness area or a "natural area"; rather, the statute allows a deduction where an easement protects "relatively natural habitat", § 170(h)(4)(A)(ii), provided (as we have noted) that it is a "*significant* relatively natural habitat", Treas. Reg. § 1.170A-14(d)(3)(i) (emphasis added). We are persuaded that the relatively natural habitat afforded by the River Tract easement is significant.

As we read them, the Commissioner's arguments focus on the state of the land subject to the River Tract easement, the extent to which it had previously been altered by the installation and operation of the River golf course, and the alleged inherent incompatibility between a golf course and a "relatively natural habitat". *See* § 170(h)(4)(A)(ii). However, the Eleventh Circuit has held that section 170(h)(4)(A)(ii) and Treasury Regulation § 1.170A-14(d)(3)(ii) "require[] only a 'relatively natural habitat . . . or similar ecosystem,' not that the land itself be relatively natural." *Champions Retreat v. Commissioner*, 959 F.3d at 1037 (quoting § 170(h)(4)(A)(ii)); *see also id.* at 1038 ("What matters under the Code and regulation is not so much whether all the *land* is natural, but whether the *habitat* is natural"). "These are the standards that apply despite the presence of a golf course on part of the property." *Id.* at 1037. Approximately one-third of the River Tract easement constitutes cohesive forest (concentrated primarily in the southeast corridor of the River Tract easement but also in the western portion abutting the Northeast Cape Fear River) containing the Atlantic Coastal Plain Blackwater Cove Woodland, which exists in a relatively natural state and provides a habitat for at least 25 rare species of bird, 1 rare species of insect, and 6 rare species of mammals.[29] That the River golf course itself provides modest ecological value for these rare species does not diminish the value of the otherwise natural features of the River Tract easement that do support a "relatively natural habitat of fish, wildlife, or plants". *See* § 170(h)(4)(A)(ii). This conclusion is vindicated by the increase in the diversity of rare species that has

---

[29] These features of the River Tract easement exceed those of the easement at issue in *Champions Retreat*, T.C. Memo. 2018-146, at \*10–13, which contained 11 bird species of conservation concern, the southern fox squirrel, and the denseflower knotweed, in undisturbed swaths constituting approximately 16% of the easement area.

[*57] occurred on the River Tract easement despite eight years of simultaneous operation of the River golf course. Ms. Wallace's report shows (and Dr. Richardson's does not rebut) that the River Tract easement has been successful at its intended conservation purpose. We therefore hold that the River Tract easement satisfies the conservation purpose requirement of section 170(h)(4)(A) by "protect[ing] . . . a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem" pursuant to section 170(h)(4)(A)(ii).

5.    *The Landing Tract easement does preserve a land area for outdoor recreation and education.*

The Landing Tract easement will satisfy a conservation purpose if it either (1) "preserv[es] . . . land areas for outdoor recreation by, or the education of, the general public," *see* § 170(h)(4)(A)(i), (2) preserves open space "for the scenic enjoyment of the general public" and yields a significant public benefit, *see* § 170(h)(4)(A)(iii)(I), or (3) preserves open space "pursuant to a clearly delineated Federal, State, or local governmental conservation policy" and yields a significant public benefit, *see* § 170(h)(4)(A)(iii)(II). Each of these purposes, which qualify under the statute, is stated in the Landing Tract easement deed as a purpose of the Landing Tract easement. We conclude that the Landing Tract easement satisfies the purpose of "preservation of land areas for outdoor recreation by, or the education of, the general public" for purposes of section 170(h)(4)(A)(i), and we therefore need not address the "preservation of open space" conservation purposes under section 170(h)(4)(A)(iii).

Treasury Regulation § 1.170A-14(d)(2)(i), elaborating "outdoor recreation", gives the examples of "the preservation of a water area for the use of the public for boating or fishing, or a nature or hiking trail for the use of the public" as qualifying conservation purposes under section 170(h)(4)(A)(i); and Treasury Regulation § 1.170A-14(d)(2)(ii) requires that the recreation be "for the *substantial and regular use* of the general public." (Emphasis added.) The Landing Tract easement deed is consistent with these provisions where it provides in Article 2.4 that the Landing Tract easement "shall continue to be and remain open for substantial and regular use by the general public for outdoor recreations or outdoor education activity".

Petitioners assert that this provision in the Landing Tract easement deed satisfies the "outdoor recreation by, or the education of, the general public" conservation purpose of section 170(h)(4)(A)(i) per

[*58] se, and petitioners rely on the U.S. Court of Appeals for the Fifth Circuit's opinion in *PBBM-Rose Hill, Ltd. v. Commissioner*, 900 F.3d at 204–05, which states:

> Paragraph 2.4.1 [of the easement deed] provides that "[t]he Property is and shall continue to be and remain open for substantial and regular use by the general public for outdoor recreation." It also states that any fees charged cannot defeat such use or "result in the operation of the Property as a private membership club." Paragraph 2.4.1 creates an obligation on the owner to operate the Property in such a way that provides access to the public for "substantial and regular" recreational use. . . . Finally, as this provision refers to "[t]he Property" in its entirety, the Commissioner's argument that the deed allows the owner to prevent the public from accessing certain areas of the land fails.
>
> In sum, the terms of the recreation easement here fulfill the public-access requirement in § 170(h)(4)(A)(i).

Petitioners assert that the Landing Tract easement satisfies the outdoor recreation or education purpose in three ways: the general public may play golf on the Landing golf course by reserving a tee time and paying a fee; the Landing Tract easement is used for youth educational activities related to golf; and the general public may freely use the Landing Tract easement's hiking and biking trails.

The Commissioner counters that, despite the ostensible public access provision in the Landing Tract easement deed, the Landing Tract easement is in fact part of a private community "surrounded by fences or walls . . . and can only be accessed by guarded gates at the vehicle entrances to the River Landing community." According to the Commissioner,

> the general public has to have a purpose to enter the River Landing community [and accordingly to enter the Landing Tract easement]—such as a charity event or a pre-arranged round of golf. They do not have key access and cannot come and go as they please. The fact that River Landing allows non-residents and non-members to enter from time to time, with permission, does not make the community [and the Landing Tract easement] 'open' to the

[*59] general public, in the same way that one's home is not open to the general public.

The parties agree that, for members of the general public to play golf on the Landing golf course, they "must call the pro shop, arrange a tee time, come to the visitor's entrance, and state that they were there to play golf, and that the guard would [then] open the manual gate"—and that doing so also requires them to pay a fee. The Commissioner made no showing that these requirements are substantially more onerous than those a member of the public would face to play golf on a public municipal course. The parties also agree that members of the general public who are attending an educational or charity event hosted on the Landing Tract easement may enter the property but that they must pass through the gated entrance and state their purpose in order to park inside of the River Landing community. Many a state or national park has an equivalent gatehouse or kiosk where a visitor may be stopped to pay an entrance or parking fee. Moreover, members of the general public who merely want to use the hiking and biking trails of the Landing Tract easement are able to enter by way of a paved trail that runs past the guard stand at the entrance of River Landing but which does not require any inspection by the guards nor any payment of a fee and which is not closed off at any time of day in any season. Furthermore, the River Landing development (and thus the Landing Tract easement) is not entirely enclosed by fencing, and the guarded gate entrances are therefore not the only means of accessing the property.

Petitioners' uncontradicted evidence shows that the development is truly open to this public use, and there is no evidence to support any suspicion that in fact it is a closed facility for members only. Any substantial attempt by River Landing to clamp down on this public use would violate the easement, and NALT would be responsible to resist the violation.[30]

Altogether, the evidence shows that the Landing Tract easement deed guarantees the general public the right to access the Landing Tract easement for outdoor recreation and educational activities, and that the

---

[30] If NALT were to fail to enforce the terms of the Landing Tract easement deed, then "the Attorney General, the district attorney, a beneficiary, or any other interested party may maintain a proceeding to enforce a charitable trust." N.C. Gen. Stat. § 36C-4-405.1(a) (2006); *cf. Finley v. Brown*, No. 17 CVS 2812, 2017 WL 3841645, at *1 (N.C. Super. Ct. Sept. 1, 2017) (permitting suit by "one of five directors of the Foundation's board of directors").

[*60] general public does so on a substantial and regular basis. Approximately one-third of golf rounds played are by non-members, i.e., members of the general public. Furthermore, the hiking and biking trails on the Landing Tract easement are accessible to the general public year round, and members of the general public may freely enter the Landing Tract easement for this purpose from the trail head at the front entrance of River Landing. We therefore hold that the Landing Tract easement satisfies the conservation purpose requirement of section 170(h)(4)(A) by "preserv[ing] . . . land areas for outdoor recreation by, or the education of, the general public" pursuant to section 170(h)(4)(A)(i).

C.      *The River Tract and Landing Tract easements protect their conservation purposes in perpetuity.*

1.      *The statute and regulations permit but limit a donor's reservation of rights.*

Section 170(h)(5)(A) provides that "[a] contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity", and we explained in *Belk v. Commissioner*, 140 T.C. 1, 12 (2013), *supplemented by* T.C. Memo. 2013-154, *aff'd*, 774 F.3d 221 (4th Cir. 2014), that "the section 170(h)(5) requirement that the conservation purpose be protected in perpetuity is separate and distinct from the section 170(h)(2)(C) requirement that there be real property subject to a use restriction in perpetuity."

Because a "qualified conservation contribution" can be a donation of a *partial* interest in property, § 170(f)(3)(B)(iii), a donor of a conservation easement may reserve in the easement deed rights permitting them to make continued use of the property. However, to be entitled to a charitable contribution deduction for donation of a conservation easement, Treasury Regulation § 1.170A-14(b)(2) requires that "[a]ny rights reserved by the donor in the donation of a perpetual conservation restriction must conform to the requirements of this section [i.e., Treasury Regulation § 1.170A-14]. See *e.g.*, paragraph (d)(4)(ii) [scenic enjoyment], (d)(5)(i) [historic preservation], (e)(3) [inconsistent use permitted], and (g)(4) [retention of qualified mineral interest] of this section." To ensure perpetual protection of the conservation purpose of the easement, Treasury Regulation § 1.170A-14(g)(1) provides that "any interest in the property retained by the donor (and the donor's successors in interest) must be subject to legally enforceable restrictions . . . that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation." *See also*

**[\*61]** *Turner*, 126 T.C. at 311 (citing Treas. Reg. § 1.170A-14(g)(1)). "A donor may continue a pre-existing use of the property that does not conflict with the conservation purposes of the gift". Treas. Reg. § 1.170A-14(e)(3). But the restrictions on a donor's retained rights in a conservation easement are not limited to protecting only the intended conservation purpose of the easement, because Treasury Regulation § 1.170A-14(e)(2) provides that "a deduction will not be allowed if the contribution would accomplish one of the enumerated conservation purposes but would permit destruction of other significant conservation interests." That is, an "inconsistent use" of the property (i.e., a use that destroys "other significant conservation interests") is generally impermissible. "A use that is destructive of conservation interests will be permitted only if such use is necessary for the protection of the conservation interests that are the subject of the contribution." *Id.* subpara. (3).

Altogether, these regulations provide that a donor (1) may reserve in the easement deed rights to make continued use of the easement property, provided that there are enforceable restrictions to prevent uses inconsistent with conservation purposes, (2) may continue pre-existing use of the easement property that does not conflict with the conservation purposes of the gift, and (3) cannot use the property in such a way that would destroy other significant conservation interests (unless pursuant to protecting the conservation purpose of the easement). We will now examine the reserved rights in the River Tract easement deed and the Landing Tract easement deed to determine whether they comply with these regulations and protect their conservation purposes in perpetuity.

> 2. *Rights are reserved in the River Tract and Landing Tract easement deeds.*

For most of the reserved rights in the River Tract easement deed and the Landing Tract easement deed, the donor's exercise of the rights requires advance approval from NALT to ensure that conservation purposes are not threatened or undermined, and we see no reason—nor does the Commissioner argue for one—why NALT would approve exercise of a reserved right that harmed the conservation values of the River Tract easement or the Landing Tract easement. Accordingly, for those reserved rights requiring approval from NALT, we will not further address whether they fail to protect the conservation purpose of the River Tract easement and the Landing Tract easement in perpetuity.

[*62] However, not every reserved right in the River Tract easement deed and the Landing Tract easement deed is subject to NALT's approval. For example, Articles 3.1 and 3.3 of the River Tract easement deed permit Duplin Land to build certain structures and alter the landscape in the easement areas in the interest of maintaining the golf courses. We will therefore examine whether any reserved right which does not require advance approval from NALT fails to protect the respective conservation purposes of the River Tract easement and the Landing Tract easement in perpetuity.

3. *The River Tract easement deed protects its conservation purpose in perpetuity notwithstanding the reserved rights.*

The Commissioner argues that "[t]he reserved rights completely vitiate many of the restrictions", and specifically points out that the reserved rights to build additional structures, alter land features, remove vegetation, and install fences pertinent to operation of the River golf course "prioritize[] the golf course over any natural habitat". The Commissioner asserts that "[g]iven these sweeping reserved rights, the Easements serve to protect nothing other than two private golf courses and the surrounding golf course development."

We view the reserved rights to continue operation of, maintain, repair, improve, and replace (in the event of casualty loss) the River golf course as existing to support "a pre-existing use of the property that does not conflict with the conservation purposes of the gift". *See* Treas. Reg. § 1.170A-14(e)(3). We so conclude because even if these reserved rights are fully exercised (without the approval of NALT being required), the golf courses themselves will be maintained according to environment-friendly "best practices", and around the golf courses a relatively natural habitat still exists in the undisturbed portions of the River Tract easement constituting approximately one-third of its area. Furthermore, exercising these reserved rights does not "permit destruction of other significant conservation interests", *see* Treas. Reg. § 1.170A-14(e)(2), because they do not undermine outdoor recreation by, or education of, the general public, nor undermine protection of a relatively natural habitat, preservation of open space, or the preservation of a historically important land area or structure, *see* § 170(h)(4)(A). We therefore hold that the River Tract easement protects its conservation purpose in perpetuity and satisfies section 170(h)(5)(A).

**[\*63]**    4.    *The reserved rights in the Landing Tract easement deed facilitate its perpetual conservation purpose.*

The Commissioner points to the same supposed defects to argue that the Landing Tract easement deed, like the River Tract easement deed, fails to protect its conservation purpose in perpetuity. However, having held above in Part III.B.5 that the Landing Tract easement deed satisfies the conservation purpose of "preserv[ing] . . . land areas for outdoor recreation by, or the education of, the general public", *see* § 170(h)(4)(A)(i), we observe now that the reserved rights to maintain, repair, improve, and continue the operation of the Landing golf course (as well as the nature trails through the Landing Tract easement) further that conservation purpose and do not otherwise undermine any other conservation purpose, *see* Treas. Reg. § 1.170A-14(e)(2) and (3). We therefore hold that the Landing Tract easement protects its conservation purpose in perpetuity and satisfies section 170(h)(5)(A).

IV.    *Valuing the easement donations*

A.    *General principles of valuation*

Generally the amount of a charitable contribution deduction under section 170(a) for a donation of property is the "fair market value" of the property at the time of the donation. Treas. Reg. § 1.170A-1(c)(1). Treasury Regulation § 1.170A-1(c)(2) defines fair market value to be "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." With respect to valuing a donation of a partial interest in property, Treasury Regulation § 1.170A-7(c) provides that "[e]xcept as provided in § 1.170A-14, the amount of the deduction under section 170 . . . is the fair market value of the partial interest at the time of the contribution." And Treasury Regulation § 1.170A-14(h)(3)(i) in turn sets forth the following method for valuing a perpetual conservation restriction:

> [Sentence 2:]  If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements. [Sentence 3:]  If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a

**[*64]** perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction.  [Sentence 4:]  The amount of the deduction in the case of a charitable contribution of a perpetual conservation restriction covering a portion of the contiguous property owned by a donor and the donor's family . . . is the difference between the fair market value of the entire contiguous parcel of property before and after the granting of the restriction.

The fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record.  *McGuire v. Commissioner*, 44 T.C. 801, 806–07 (1965); *see, e.g.*, *Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).  In these cases, we do not have "a substantial record of sales of easements comparable to the donated easement", and we will therefore base our valuation on the before and after method.  Treas. Reg. § 1.170A-14(h)(3)(i).  To do so—

If before and after valuation is used, the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use.

*Id.* subdiv. (ii); *see also Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986).  A property's highest and best use is the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future".  *Olson v. United States*, 292 U.S. 246, 255 (1934).

To show the values of the conservation easements in these cases, as well as the properties' respective highest and best uses, the parties have offered the reports and testimonies of expert witnesses.  *See* Rule 143(g).  "Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand the evidence that will determine a fact in issue", and we evaluate expert opinions "in light of the demonstrated qualifications of the expert and all other evidence of

[*65] value." *Parker v. Commissioner*, 86 T.C. 547, 561 (1986) (citing Fed. R. Evid. 702). Where experts offer competing estimates of fair market value, we decide how to weigh those estimates by, inter alia, examining the factors they considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962). We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 294–95 (1938); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990). We may also reach a decision as to the value of property that is based on our own examination of the evidence in the record. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

Having established the subject and method of valuation, as well as the scope of evidence with which to do so, we will now explain the basis of our valuations of the respective easements at issue as stated above in the findings of fact.

B.  *Valuation under consistent assumptions about development*

River Landing is a cohesive development that, despite spanning two tracts of land, must be viewed in the aggregate—as must the two easement donations, which were conceived and executed as organized, simultaneous donations. River Landing uses common roads and nature paths as well as shared facilities such as the golf clubhouse and sports complex that are located on both Tracts and are used by residents and the general public. However, petitioners' valuation of each easement asserts a pre-donation highest and best use of residential development and assumes that the adjacent tract would continue operating as a golf course. But the development of each tract while the other remains a golf course can only exist in the abstract. Both golf courses cannot be destroyed if both valuations depend on and assume the continued operation of a golf course. Not every purchaser of a residence in River Landing is a necessarily a golfer, but golf is critical to the development. The reality is (and petitioners essentially admit) that an arm's-length purchaser of either (or both) of these tracts would look to develop only one of them and would keep the other as a golf course. No one would purchase River Landing to dismantle both golf courses and replace them both with residences, since thereafter there would be no real market for golf-less residences. The parties agree that, when River Landing is considered in the aggregate, the River Tract is the one to be developed and the Landing Tract must remain a golf course. We will therefore value the River Tract on the assumption that its highest and best use

**[*66]** before the River Tract easement donation was development, and we will value the Landing Tract on the assumption that its highest and best use before the Landing Tract easement donation was continued use as a golf course (with the modest development that would not interfere with the continued operation of the Landing Tract golf course).

The reports of the Commissioner's expert, Mr. Hughes, opine that the highest and best use of both the River and the Landing Tracts would have been to continue operating as a golf course and to hold portions of the Tracts for potential development in the future once the housing market conditions improved. We reject this opinion for several reasons. First, just as the highest value of the two tracts before the easement donations would not be realized if both golf courses were to be developed into lots, the highest value would also not be realized if both Tracts remained golf courses. The simultaneous operation of both courses had long been a losing venture, and we are sure that any willing buyer considering River Landing would have so reckoned. Second, we doubt that any arm's-length buyer of these tracts would purchase them to hold for development in the future, given that the golf courses were not yet profitable in 2010 whereas the housing market conditions were improving. However, we do not abandon altogether Mr. Hughes' valuations of the River Tract and the Landing Tract as golf courses (which valuations are undisputed because Mr. Dean did not value the highest and best use of either Tract before or after its easement donation as a golf course). We will rather adopt and apply Mr. Dean's methodology of valuing the River Tract as residential development (with some correction), and we will apply Mr. Hughes's methodology of valuing the River Tract and the Landing Tract as golf courses.

C.    *Valuation of the River Tract easement*

Mr. Sauter prepared the qualified appraisal attached to petitioners' returns, and he valued the highest and best use of the River Tract before the easement donation as "155 to 160 single-family lots of the size and type found on adjacent Tract at River Landing" on the basis of a subdivision plan prepared by C.E. Group in 2010. That subdivision plan provided for 233 total lots on the River Tract, but for reasons not explained in his appraisal report Mr. Sauter determined the appropriate number of lots to be between 155 and 160. At trial petitioners offered the expert report of Mr. Dean, who determined that the highest and best use of the River Tract before the easement donation was development of 233 lots on the basis of that same subdivision plan prepared by C.E.

**[*67]** Group.[31] However, a pocket of 61 lots of the subdivision plan for the River Tract is located on the existing driving range for River Landing, and development of this portion would leave the Landing Course without a driving range for its operation. Because we view the respective uses and valuations of the River Tract and the Landing Tract in the aggregate, we think it is important to the continued use of the Landing Tract as a golf course that this portion of the River Tract remain a driving range. Therefore, we will remove from the River Tract subdivision plan the 61 lots (evidently included by Mr. Dean but not by Mr. Sauter) that are located on the driving range and will proceed to determine the value of developing 172 lots on the River Tract.

Mr. Dean uses the income approach to value developing the River Tract with residential lots. To estimate gross revenue, Mr. Dean categorizes new lots into river front lots, pond/view lots, and interior lots. He then assigns a sale price to each type of lot using comparable market data, estimates the time it would take to sell the amount of new lots using comparable market data, discounts revenue from sales in future years to present value, and then deducts the cost of constructing the development and selling the lots. We find Mr. Dean's method of determining the gross revenue of developing the River Tract with residential lots to be credible and reliable. Using sales of comparable lots in similar communities in North Carolina, Mr. Dean estimates the sale price of interior lots to be $66,400, of pond/view lots to be $114,000, and of river front lots to be $170,000. In the C.E. Group subdivision plan there are 61 pond/view lots, 45 river front lots, and (as adjusted in this Opinion) 66 interior lots.

Mr. Dean's report includes the following costs of selling lots on the River Tract to estimate the net present value of each type of lot: sales commissions (5%), advertising (10%), overhead/contingency (2%), real estate taxes ($1,266 per lot), and entrepreneurial profit (15%). (These are the transaction costs of selling the lots and are in addition to the infrastructure costs of developing the lots themselves.) The Commissioner does not criticize Mr. Dean's estimation of the transaction cost of selling the lots. However, the Commissioner correctly points out that Mr. Dean's estimate of the infrastructure cost to develop the lots does not include the cost of removing the existing features of the River Course such as cart paths, sand traps, irrigation system, and the

---

[31] C.E. Group prepared a revised subdivision plan for River Landing in 2018 that included additional lots on the Landing Tract, but no additional lots on the River Tract. The 2010 and 2018 subdivision plans are identical as to the River Tract.

**[\*68]** associated waste. The Commissioner also argues that Mr. Dean's report fails to estimate the effect of single-loaded streets (i.e., lots placed on only one side of the street) on the overall cost to develop each lot and asserts that single-loaded streets could potentially double the cost of development per lot. The Commissioner does not provide an alternative estimate for the development cost per lot. Mr. Dean originally estimated the infrastructure cost per lot as $24,300, but then made a downwards adjustment to $19,400 due to "economies of scale" because the River Tract subdivision contains more lots than the comparables used to derive a cost per lot. Neither did Mr. Dean account for the potential savings of the lots having already been cleared due to the previous golf course development. Because Mr. Dean's cost estimate included only the cost of residential infrastructure per lot and not the cost of removing the golf course features, we will not adopt his downward adjustment for economies of scale and will estimate the cost to develop 172 lots on the River Tract as his original $24,300 per lot.

After discounting the net sale proceeds in future years to present value (using Mr. Dean's present value discount rate, which the Commissioner does not criticize), and deducting the infrastructure costs from that present value figure, the total present value of developing the River Tract with residential lots is $5,140,274—this figure is the fair market value of the highest and best use of the River Tract in 2010 before the easement donation. Mr. Hughes determined the value of using the River Tract as a golf course after the easement donation to be $2,350,000. Therefore, the value of the River Tract easement, and the value of the charitable contribution deduction for its donation, is $5,140,274 minus $2,350,000, or $2,790,274.

### D. *Valuation of the Landing Tract easement*

Given our view (and the parties' effective agreement) that development of River Landing as a whole would require that the Landing Tract remain a golf course, the highest and best use of the Landing Tract before the easement donation is continued operation as a golf course. In valuing the highest and best use of the Landing Tract as a golf course, the Commissioner's expert, Mr. Hughes, noted that 5 lots on the Landing Tract (2 lots on hole 14 and 3 lots on hole 18) could potentially be added and developed without disturbing the existing features of the Landing Course. Using data on recent lot sales in River Landing, Mr. Hughes posited that the reasonable average price for the five lots is $60,000 per lot—of which one-third is allocable to the land, one-third is the cost of development, and one-third is for overhead and

[*69] developer's profit. Mr. Hughes estimated the land value of each lot to be $20,000 and estimated that holding the five lots for potential development would increase the value of the Landing Tract by $100,000 before the easement donation. On the basis of Mr. Hughes's report, the Commissioner asserts that "petitioners are not entitled to a deduction greater than the diminution arrived at by respondent's expert of $100,000", which we take as a well-warranted concession that petitioners are entitled to deductions of $100,000.

Mr. Dean's valuation of the Landing Tract used the subdivision plan prepared by C.E. Group that proposed 296 lots (of which 252 are interior lots and 44 are pond/view lots). Because, after the development of the River Tract, this development of the Landing Tract would entirely discontinue the golf operation, we radically adjust Mr. Dean's plan down to five lots (whose categories are unknown), resulting in an approximate increase in the value of the Landing Tract between $21,500 (presuming all five lots are interior lots) and $165,000 (presuming all five lots are pond/view lots). But petitioners did not attempt to show whether the five lots posited by Mr. Hughes would be interior lots, pond/view lots, or a combination thereof or what their associated values would be. We therefore accept the Commissioner's concession, based on Mr. Hughes's report, that the forgone value of developing five lots on the Landing Tract without disturbing the Landing Course—and therefore the value of the Landing Tract easement—was $100,000.

V.    *Penalties under section 6662*

The Commissioner has conceded all penalties at issue with respect to Dell and Wendy Murphy in Docket No. 14536-16. We therefore address penalties as to Wendell and Linda Murphy in Docket No. 14541-16.

A.    *Penalty principles*

Section 6662(a) and (b)(1)–(3) imposes an accuracy-related penalty "equal to 20 percent of the portion of the underpayment to which this section applies" upon a taxpayer who underpays his tax due to, inter alia, "[n]egligence or disregard of rules or regulations", a "substantial understatement of income tax", or a "substantial valuation misstatement". An understatement of income tax is substantial if it exceeds the greater of "10 percent of the tax required to be shown on the return for the taxable year" or $5,000. § 6662(d)(1)(A). For 2010, the year at issue, a substantial valuation misstatement exists if "the value

[*70] of any property . . . claimed on any return . . . is 150 percent or more of the amount determined to be the correct amount of such valuation". § 6662(e)(1)(A). None of these penalties will be imposed where the taxpayer had "reasonable cause". § 6664(c)(1).

In the case of a "gross valuation misstatement"—i.e., where the value of property claimed on the return is (as defined in the statute as in effect for the year at issue) 200% or more than the amount determined to be the correct valuation—the rate of the accuracy-related penalty is increased to 40%. § 6662(h)(1) and (2)(A)(i). However, Treasury Regulation § 1.6662-5(b) provides that "[n]o penalty may be imposed under section 6662(b)(3) [i.e., for substantial or gross valuation misstatements] for a taxable year unless the portion of the underpayment for that year that is attributable to substantial or gross valuation misstatements exceeds $5,000". And Treasury Regulation § 1.6662-5(h)(1) provides:

> The determination of whether there is a substantial or gross valuation misstatement in the case of a return of a pass-through entity (as defined in § 1.6662-4(f)(5) [to include a partnership and an S-corporation]) is made at the entity level. However, the dollar limitation ($5,000 or $10,000, as the case may be) is applied at the taxpayer level (i.e., with respect to the return of the shareholder [or] partner . . .).

There is no reasonable cause defense available under section 6664(c) to a gross valuation misstatement. § 6664(c)(3).

On the basis of these principles, the records in these cases, and the valuations we determined above in Part IV, we will now determine which penalties are applicable with respect to the easement donations at issue.

B.  *Section 6662 penalties with respect to Duplin Land and Wendell and Linda Murphy individually*

Duplin Land originally claimed on its S corporation return[32] charitable contribution deductions of $7,344,095 for its donation of the River Tract easement and $1,080,814 for its donation of the Landing Tract easement (totaling $8,424,909). We determined in Part IV above

---

[32] Pursuant to Treasury Regulation § 1.6662-5(h)(1) (quoted in text above), we quantify the valuation misstatement "at the entity level", i.e., as reported by Duplin.

**[\*71]** that the correct amounts of the deductions are substantially less—i.e., $2,790,274 for the River Tract easement and $100,000 for the Landing Tract easement (totaling $2,890,274). Treasury Regulation § 1.6662-5(f)(1) directs us to determine whether there is a substantial or gross valuation misstatement on a property-by-property basis.[33] Determined on that basis, Duplin Land's overstatement of the value of the River Tract easement on its return was approximately 263% (i.e., $7,344,095 ÷ $2,790,274 = 2.63), and its overstatement of the value of the Landing Tract easement on its return was approximately 1,081% (i.e., $1,080,814 ÷ $100,000 = 10.81). Therefore, both deductions reflected gross valuation misstatements under section 6662(h) because they exceeded 200% of the value determined to be correct, and they are subject to the 40% penalty, provided that they lead to underpayments greater than $5,000. *See id.*; *see also* Treas. Reg. § 1.6662-5(b), (h)(1) ("measured at the taxpayer level").

A rough-and-ready calculation (to be corrected by the parties' submissions under Rule 155) easily shows that Wendell and Linda Murphy's underpayment exceeded $5,000: They originally claimed on their joint income tax return charitable contribution deductions of $3,008,896 associated with Duplin Land's donations of the River Tract easement and the Landing Tract easement. That amount constitutes approximately 35.7% of Duplin Land's charitable contribution deduction ($3,008,896 ÷ $8,424,909 = 0.3571). Their 35.7% share of our revised valuation(s) of the River Tract easement and the Landing Tract easement ($2,890,274) is approximately $1,031,828. It therefore appears that Wendell and Linda Murphy accordingly overstated the value of the easements on their return by the difference of those two figures—i.e., $3,008,896 − $1,031,828 = $1,977,068. Section 1(a) provides that the top marginal tax rate in 2010 was 39.6%; and the amount of income reported on Wendell and Linda Murphy's return places them in the top marginal income tax bracket. On the basis of these estimates, Wendell and Linda Murphy therefore underpaid their

---

[33] Applying the property-by-property method provided in the regulations is arguably at odds with our holding above in Part IV.B that the River Tract easement and the Landing Tract easement must be viewed and valued in the aggregate because they are both part of an organized, simultaneous contribution. However, because we determine that both valuation misstatements are "gross" (i.e., greater than 200% of the values claimed on the return) regardless of whether the River Tract easement and the Landing Tract easement are viewed separately, as in the computations set forth in text (i.e., 263% and 1,081%), or in the aggregate (i.e., $8,424,909 ÷ $2,890,274 = 2.91 or 291%) for the purposes of the valuation misstatement penalty, this inconsistency does not affect our analysis and is therefore immaterial.

[*72] 2010 tax liability by $782,919 (i.e., greater than $5,000) and are subject to the 40% gross valuation misstatement penalty in section 6662(a), (e), and (h).

Since we have determined that Wendell and Linda Murphy are liable for the gross valuation misstatement penalty (and since the Commissioner has conceded that Dell and Wendy Murphy are not liable for penalties), we need not address the other penalty provisions in connection with the River Landing easements.

VI.     *Conclusion*

We hold that petitioners did not satisfy the appraisal summary requirements of section 170(f)(11) in connection with the claimed charitable contribution deductions at issue in these cases, but we also hold that their failure to do so is excused for reasonable cause because the Commissioner, in raising this issue as new matter in this litigation, failed to carry his burden to show an absence of reasonable cause. We further hold that each of the easement donations at issue satisfies the requirements of section 170(h) and that petitioners are therefore entitled to charitable contribution deductions equal to their respective fair market values as of December 2010. Having considered all evidence presented by the parties, we find those values to be $2,790,274 for the River Tract easement and $100,000 for the Landing Tract easement. Finally, we hold that Wendell and Linda Murphy's claimed deductions for contribution of the River Tract easement and of the Landing Tract easement are subject to the section 6662 gross valuation misstatement penalty.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*